KOREAN AIR LINES COMPANY, LTD., Bum Hee Lee and Bong Hyun Cho, Appellants/Cross–Appellees,

v.

STATE of Alaska, Motorola, Inc., Employers Insurance of Wausau, a Wisconsin corporation, Applied Magnetics Corporation, a California corporation, and Granite State Insurance Company, a New Hampshire corporation, Appellees/Cross–Appellants.

Nos. S–2873, S–2887.

Supreme Court of Alaska.

Sept. 1, 1989.

---

Robert C. Bundy and Kevin C. Baumgardner, Bogle & Gates, Anchorage, for appellants/cross-appellees.

Theodore M. Pease, Jr. and Kristi A. Nelson, Burr, Pease & Kurtz, Anchorage, for appellees/cross-appellants.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

On December 23, 1983, a Korean Air Lines (KAL) DC–10 and a Southcentral Air-

ways (SCA) Piper Navajo collided on a runway at Anchorage International Airport, causing extensive property damage. This crash gave rise to our opinions in *State v. Korean Air Lines*, 776 P.2d 315 (Alaska, 1989), and *State v. Oriental Fire and Marine*, 776 P.2d 776 (Alaska 1989), as well as this opinion. This action was initiated against KAL by the owners of the cargo in the KAL DC–10 and their subrogated insurance carriers. The appeal involves whether the trial judge properly granted the motion of the cargo owners and their subrogated insurance carriers for judgment notwithstanding the verdict. The jury had found that the action of KAL's flight crew had constituted wilful misconduct but that the misconduct was not the legal cause of the accident. Judge Hunt granted the JNOV motion, holding that after concluding the evidence established wilful misconduct by the defendants, fairminded people exercising reasonable judgment could not differ in concluding that KAL's wilful misconduct was a legal cause of the crash. KAL appeals the granting of the JNOV motion. We affirm.

## I. FACTS

On December 23, 1983, at approximately 2:00 p.m., a DC–10 owned and operated by KAL collided with a SCA Piper Navajo when the KAL aircraft attempted to take off from the Anchorage International Airport. The incident occurred because the KAL crew, thinking they were at the threshold of runway 32, actually began their takeoff attempt some two thousand four hundred feet from the end of runway 6L–24R [1] where the SCA aircraft was lined up for takeoff in the opposite direction.

The facts leading up to the crash are largely undisputed. The weather conditions on the afternoon of December 23 were poor. Reported visibility was ⅛ of a mile due to fog over the runway. Before the KAL DC–10 began its taxi, the Federal Aviation Administration (FAA) control tower gave the Captain, Bum Hee Lee, his

choice of taking off from Runway 6R or Runway 32. Captain Lee chose Runway 32 because it was closer and because he was afraid he would have trouble taxiing in the low visibility. Before starting the aircraft's engines, Captain Lee explained the intended taxi route to the crew. Captain Lee and First Officer Bong Hyun Cho then went over that intended taxi route on the Jeppesen charts of the airport layout. While taxiing to the runway, Captain Lee could not read any airport guidance signs; he could not see any runway markings; he could see the centerline of the taxiway only faintly and intermittently; he could not tell whether he was turning the correct number of degrees when he made turns while taxiing; he did not consult his compasses while taxiing, although the compasses would have indicated the exact degrees turned; he did not consult his Jeppesen chart of the airport layout while taxiing; he did not advise the control tower that he was having difficulty recognizing his route or that he was lost; and finally, he did not ask for a "follow-me" car to lead him to the correct runway. Captain Lee followed tracks in the snow that he assumed were left by other aircraft.

Eventually, the KAL crew arrived at a point where the taxiway they were following intersected with a runway. Captain Lee testified that he knew he was on a runway because of its white edge lights. Lee looked for the large painted numbers designating the end of Runway 32, but did not see them. Neither did he see any area on the runway which should have been cleared of snow by the jet blast of previously departing aircraft. He assumed that he was at the departure end of Runway 32. In fact, Lee was at the intersection of taxiway W–1 and runway 24R/6L. This intersection is 2,400 feet from the end of runway 24R and the beginning of active runway 6L, where Captain Holt of SCA was properly lined up for takeoff, awaiting departure clearance. The DC–10 required

---

**1.** All runways are designated according to their magnetic compass headings. For example, an airplane landing on, or taking off on, runway 32 would show a magnetic compass heading of

320°. Runways 24R/6L and 24L/6R are parallel runways running in a roughly east-west direction. Runway 32/14 runs roughly north-south.

at least 5,600 feet of runway to lift off the ground.

Co-pilot Cho advised the tower that the KAL DC–10 was holding short of runway 32, ready for takeoff. KAL 084 still did not have legal visibility. The crew could have obtained legal weather by (1) waiting for reported visibility to rise to ¼ mile, or (2) requesting the control tower to send out a certified weather reporter to take a visibility reading. KAL argues that the actual, as compared to the reported, visibility was above ¼ mile.

Assuming, as KAL argues, that it had ¼ mile visibility, then its crew should have seen (1) the white edge lights of the parallel runway directly ahead of them; (2) at least six pair of runway edge lights lining the eastern two-thirds of runway 24R, the runway they were holding short of, extending to their left; and (3) the amber runway edge lights lining the last 2,000 feet of runway 24R, extending to their right. Any of these sights would have conclusively shown that the aircraft was not on runway 32. However, the KAL crew all testified that none of the lighting conditions mentioned above in 1, 2 or 3 were ever seen by them prior to the occurrence of this accident.

Once the KAL aircraft turned into takeoff position, Captain Lee felt it necessary to confirm with his co-pilot that he turned onto Runway 32 and not, instead, onto the north/south taxiway that runs parallel to it. Captain Lee testified that at no time did he ever believe or have any inkling that the DC–10 might be on the wrong runway. After KAL held in takeoff position for approximately one minute, the control tower cleared them for takeoff on Runway 32. Nonetheless, the crew hesitated for two minutes.

Captain Lee testified that when he lined up on the runway he could only see two or three runway edge lights. However, prior to applying full power to the DC–10, he was able to see six or seven edge lights. If six or seven edge lights were visible, the first two would have been white and the remaining four amber, disclosing the proximity of the end of the runway. Captain

Gary Holt, of the SCA plane, who was sitting 2,400 feet away on the same runway, testified that he was able to see only three edge lights at that time.

Captain Lee admitted that just prior to takeoff he was concentrating so hard on the visibility outside the aircraft that he forgot to follow his normal practice of confirming the aircraft's heading as shown by the cockpit directional instruments against the runway heading. KAL's expert witness, Captain Kim, testified that KAL trains its pilots to always cross-check the cockpit compasses against the runway heading when lined up for takeoff. KAL's Operating Manual also requires the co-pilot to cross-check the flight instruments before takeoff. Neither Captain Lee nor co-pilot Cho looked at their directional instruments to cross-check the heading of the DC–10 prior to takeoff.

The KAL crew applied full power to the DC–10 and began takeoff down the wrong runway. The DC–10 ran over the SCA commuter plane which was properly lined up for takeoff in the opposite direction. Both aircraft were destroyed.

## II. PROCEEDINGS

The crash destroyed the cargo, which was owned by Motorola, Inc. and Applied Magnetics Corporation. Motorola, Applied Magnetics and their respective subrogated insurers, Employers Insurance of Wausau and Granite State Insurance Company (hereinafter collectively referred to as "Motorola") brought suit against KAL for the loss of the cargo.

The parties stipulated that the Warsaw Convention was applicable to this accident and agreed to present two issues to the jury: 1) whether any of the mistakes made by the KAL crew on December 23, 1983, constituted "wilful misconduct" as defined within Article 25 of the Warsaw Convention of 1929, 49 U.S.C.App. § 1502 note, and 2) if so, whether such wilful misconduct was a legal cause of the accident.

Under the Warsaw Treaty, international carriers are virtually subject to strict liability for losses, but that liability is limited to

twenty dollars per kilogram for lost cargo unless it is proven that the loss was legally caused by the carrier's "wilful misconduct" as that term is defined by article 25 of the treaty. 49 U.S.C.App. § 1502, articles 22(2)–(4), 25.[2] If the carrier's wilful misconduct is proved to have legally caused the accident, the claimant is entitled to the actual value of the cargo. Under the per-kilogram limit, Motorola would be allowed to recover only $118,580 for their cargo, rather than its full stipulated value of $2,050,000.

At trial, Motorola contended that the performance of the KAL crew in taking off in the above-described circumstances, without knowing where they were, was wilful misconduct. KAL contended that although their acts were wrongful and were the cause of the crash, their performance was only negligent and did not amount to wilful misconduct.

Motorola requested a directed verdict on liability after the presentation of KAL's evidence and again after the presentation of all of the evidence. Judge Hunt denied both motions.

The jury was given a two-interrogatory special verdict form. After deliberation, the jury found that KAL had engaged in wilful misconduct,[3] but that the wilful misconduct was not the legal cause[4] of the crash. Motorola then moved for judgment notwithstanding the verdict or, in the alternative, a new trial on the issue of legal causation. Motorola argued that (1) the causation issue should have been resolved by directed verdict and should never have gone to the jury, and (2) the jury finding of no legal causation could not stand because no reasonable jurors could have differed on the issue.

Judge Hunt granted the JNOV motion, holding that after concluding the evidence established wilful conduct by KAL, fair-minded people exercising reasonable judgment could not differ in concluding that KAL's wilful misconduct was a legal cause of the crash. KAL appeals.

## III. DISCUSSION

KAL argues that Judge Hunt erred in granting the JNOV motion since a reasonable juror could have found that one or more collateral, causally remote aspects of the crew's actions constituted wilful misconduct but did not constitute a substantial

---

2. For a discussion of the wilful misconduct standard, see *Republic Nat'l Bank of N.Y. v. Eastern Airlines*, 815 F.2d 232, 238–39 (2d Cir.1987); *Butler v. AeroMexico*, 774 F.2d 429, 430–32 (11th Cir.1985); *KLM v. Tuller*, 292 F.2d 775, 778–82 (D.C.Cir.1961); *Grey v. American Airlines*, 227 F.2d 282, 285–86 (2d Cir.1955); *Pekelis v. Transcontinental & Western Air*, 187 F.2d 122, 124–25 (2d Cir.1951).

3. Jury Instruction No. 32 defined wilful misconduct:

I will now define "willful misconduct" for you. "Willful misconduct" does not mean that KAL or its crew had a deliberate intention to wreck the DC–10 jet or to commit suicide. It is not necessary for the plaintiffs to prove that KAL or its pilots intended to cause the harm which resulted from their conduct.

The defendants' behavior is willful misconduct if they intentionally performed or failed to perform some act or a series of acts either:

(1) with knowledge that such act or omission would probably result in injury or damage, or

(2) in a manner from which could be implied reckless disregard of the probable consequences of the act or omission.

4. The court provided the jury with the following instruction on legal causation:

### Instruction 33

I will now define "substantial factor" for you. I instructed you earlier that in order to find for plaintiffs to win on this claim, willful misconduct of KAL, Capt. Lee or First Officer Cho must be a substantial factor in bringing about the crash. However, it need not be the sole substantial factor contributing to the crash. If you find that willful conduct by defendant KAL or any of its crew or employees was a substantial factor to this aircraft crash, that is sufficient to sustain plaintiffs' claim against KAL even though you may find that there were also other contributing factors.

In order to determine whether defendants' willful misconduct was a substantial factor in bringing about the crash, two things must be more likely true than not true:

(1) that the crash would not have happened but for the defendants' willful misconduct; *and*

(2) the willful misconduct was so important in bringing about the crash that reasonable people would regard it as a cause and attach responsibility to it.

factor in causing the crash. In response, Motorola argues that the wilful misconduct found by the jury was, as a matter of law, a legal cause of the crash.

### A) Standard of Review

■ "[M]otions for directed verdicts or for judgments n.o.v. raise questions as to the legal sufficiency of the evidence." *Bolden v. City of Kodiak*, 439 P.2d 796, 800 (Alaska 1968). This court's role in reviewing a grant of a motion for a directed verdict or JNOV is not to weigh conflicting evidence or judge the credibility of witnesses, but rather to determine whether evidence, when viewed in light most favorable to the non-moving party, is such that reasonable persons could not differ in their judgment. *Knight v. American Guard & Alert, Inc.*, 714 P.2d 788, 793 (Alaska 1986); *Dura Corp. v. Harned*, 703 P.2d 396, 402 (Alaska 1985); *Kavorkian v. Tommy's Elbow Room, Inc.*, 694 P.2d 160, 163 (Alaska 1985). As the court noted in *Dura Corp.*, "The test is objective; and, if there is room for diversity of opinion among reasonable people, the question is one for the jury." 703 P.2d at 402.

As a result, if viewing the evidence in a light most favorable to KAL, reasonable people could differ in their judgment, the grant of the JNOV was inappropriate and must be reversed. This court must determine whether reasonable people could conclude after finding wilful misconduct by KAL that this conduct was not the legal cause of the accident.

### B) As a Matter of Law, Was KAL's Wilful Misconduct a Legal Cause of the Accident?

■ KAL presents two scenarios in which it contends that a reasonable jury could find a lack of legal causation after finding wilful misconduct. First, KAL argues that a reasonable juror could "have found that the crew's failure to consult their Jeppesen charts while taxiing was wilful misconduct but not a cause of the accident." KAL argues that the jury could have found that the crew would have gotten lost even if they had used the charts during taxiing.

Second, KAL contends that a reasonable juror would have been justified in finding that the take off with reported visibility below company minimums was wilful misconduct but not a legal cause of the accident. KAL argues that actual visibility was within the ¼ mile company minimums at take off. Therefore, KAL argues that a reasonable jury could conclude that this "technical" violation was wilful misconduct but not a legal cause of the accident since the crash would have occurred regardless of the violation.[5]

Motorola denies the plausibility of either of these theories. As to the first scenario, Motorola argues that KAL has mischaracterized the arguments made to the jury as to which conduct by KAL constituted wilful misconduct. Motorola acknowledges that its expert witness did criticize the KAL crew's actions in not placing the Jeppesen charts on the aircraft yoke during taxiing. However, Motorola contends that it did not argue to the jury that the failure to use the charts while taxiing was wilful misconduct. Instead, Motorola asserts that its closing arguments to the jury focused on the crew's failure to cross-check the runway heading by using the Jeppesen chart and the aircraft's compasses.

As to the second scenario, Motorola argues that the undisputed evidence clearly established that KAL was in violation of the visibility requirements since the official transcribed weather information indicated that visibility was less than one-eighth of a mile.[6] Motorola argues that KAL should

---

5. *See Bakke v. State*, 744 P.2d 655, 656 (Alaska 1987) ("if the injury would have happened in exactly the same manner in the absence of the act or omission, that act or omission is not the proximate cause of the injury").

6. It was not a violation of the minimum visibility requirements to taxi into takeoff position

without the required visibility. Thus, the very fact that the KAL flight was taxiing below minimums—so as to not be able to see certain landmarks that would have indicated their incorrect position—was not a violation which contributed to the crash.

As KAL's expert testified, the KAL crew had to have reported visibility of ¼ mile to take off;

have requested that a certified weather observer be sent to the field to do an on-site check of the visibility on runway 32. If KAL had done this, Motorola contends, the observer would have discovered the fact that the KAL flight was not lined up on the correct runway and thus would have prevented the accident.

We find Motorola's arguments to be persuasive. While the two scenarios presented by KAL for upholding the jury verdict are hypothetical possibilities, we conclude that after reviewing the evidence and arguments actually presented at trial that the jury could not have reasonably relied on these scenarios in reaching its verdict. The critical issue at trial was whether the KAL crew's actions in failing to verify their position with their compasses in poor visibility and in taking off in violation of FAA visibility requirements constituted wilful misconduct.

■ We conclude that after finding the crew's actions to be wilful misconduct a reasonable jury could only conclude that this wilful misconduct was a legal cause of the accident.[7] As a matter of law, Captain Lee's failure to cross-check his runway heading against the compass and taking off in violation of the visibility requirements were legal causes of the accident.[8] The crash would not have occurred but for the crew's failure to cross-check or the crew's

decision to take off in violation of the reported visibility requirement. While these actions may not have been the sole cause of the accident, we conclude that reasonable persons would regard this conduct as a cause and attach responsibility to it. We therefore affirm the superior court's entry of judgment notwithstanding the verdict.

C) Court's Refusal to Admit Exhibits 71, 72, 74 and 80, and the Related Testimony of Wylie and Hynes

■ Exhibits 71, 72, 74 and 80 and the related testimony of Jerry Wylie of the FAA and John Hynes of the State involved evidence that the FAA and the State were aware, at least since 1978, that ground navigation in foggy conditions was a dangerous problem at Anchorage International Airport. KAL argues that the trial court erred in excluding this evidence since it shows that its flight crew's taxi errors were not wilful misconduct since similar mistakes were made by a number of other pilots.

Under Alaska Civil Rule 61, the judgment in a case must be reversed if 1) evidence was erroneously excluded by the trial court and 2) the exclusion prejudiced the offering party. Judge Hunt excluded the exhibits and the authenticating testimony on the grounds of relevance[9] and potential prejudice.[10] This court "may affirm a

---

the KAL crew could not legally rely on the radar visual range indicators (RVRs).

7. We reject KAL's contention that Judge Hunt was required to also find that KAL's conduct constituted wilful misconduct as a matter of law in order to overturn the jury verdict. The cases cited by KAL do not stand for the proposition that the court must find both wilful misconduct and legal causation as a matter of law. The jury having concluded that KAL's actions constituted wilful misconduct, the court need only consider whether reasonable jurors could differ as to whether KAL's wilful misconduct was a legal cause of the crash. *Sloan v. Atlantic Richfield Co.*, 541 P.2d 717, 723 (Alaska 1975); *City of Fairbanks v. Nesbett*, 432 P.2d 607, 609 (Alaska 1967).

8. An act or omission is said to be the proximate cause of an injury when the injury would not have happened "but for" the act or omission and reasonable persons would regard this act or omission as a cause and attach responsibility to it. A corollary of this statement is, of

course, that if the injury would have happened in exactly the same manner in the absence of the act or omission, that act is not the proximate cause of the injury. An act or omission need not be the *single* producing cause of an injury to be a proximate cause, but need only be a producing cause. A finding of proximate cause is normally considered to be factual in nature, and as such will be reversed only when clearly erroneous. *Bakke*, 744 P.2d at 656 (citations omitted).

9. Alaska Rule of Evidence 401 provides:

Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

10. Alaska Rule of Evidence 403 provides:

Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the

trial court's exclusion of evidence even though the affirmance is based on a ground not relied upon by the trial court." *Sloan v. Atlantic Richfield Co.,* 541 P.2d 717, 722 n. 6 (Alaska 1975).

Judge Hunt noted that exhibits 71, 72 and 74 are related to budget requests, and exhibits 71 and 72 are so general as to not be probative. Exhibit 74 discusses past taxiing problems of pilots and ground personnel. Exhibit 80, a pilot bulletin written after the crash, discusses an alarming number of dangerous incidents on the same taxiway area. However, in the deposition of the author of the letter, the only incident the author could identify was the KAL crash.

We conclude that this evidence was properly excluded. The difficulty of taxiing in the fog was not a contested issue in the case.[11] While the evidence's relevancy is a closer question, exclusion of the evidence under Rule 403 was appropriate. Motorola and KAL agreed that taxiing in fog was a dangerous condition and evidence of the State's efforts to install ground radar would only have confused the jury.[12]

Furthermore, exclusion of the evidence did not prejudice KAL. KAL was allowed to introduce other evidence as to the confusion on the taxiways on the day of the crash. Brantley, a safety officer for the airport, testified that he had to locate and lead other aircraft that had become lost in the fog. Airport manager William Chambers testified that he became lost when he drove out to look for the KAL and SCA wreckage immediately after the crash.

We therefore affirm the trial court's exclusion of this evidence.

**D) Attorney's Fees**

In its amended final judgment, the trial court awarded Motorola $305,358.70 in attorney's fees pursuant to Alaska Civil Rule 82 based on a total money judgment of $3,003,586.99.[13]

KAL argues that the court erred in not specifying the exact amount of fees awarded and by allowing the clerk to calculate the fees according to the schedule. Secondly, KAL argues that the award is clearly excessive because it constitutes a full award of fees and exceeds the actual attorney's fees incurred by Motorola.[14] Finally, KAL argues that it was error for the judge to award such a large sum of fees without an affidavit from Motorola's counsel setting forth the number of hours expended on the case.

While the judgment only refers to "ARCP 82 attorneys' fees," Motorola sought fees pursuant to the Rule 82(a)(1) schedule. Given the fact that the court did not set forth facts to justify departing from the schedule, it is logical to assume the court intended that the clerk calculate the fees according to the schedule.

Motorola's counsel were hired under a contingency fee arrangement. This fee arrangement resulted in legal fees to Motorola of $795,162. This amount is clearly greater than the $305,358.70 in fees awarded by the court. We therefore find that Motorola's actual fees were in excess of the fees awarded by the court. As to the itemization of hours expended for legal services, we have affirmed a number of awards of attorney's fees without an itemization of such costs in the record. *See, e.g., Fairbanks North Star Borough v. Tundra Tours,* 719 P.2d 1020, 1037–38 (Alaska 1986); *Kaps Transp., Inc. v. Henry,* 572 P.2d 72, 76 (Alaska 1977).

issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

11. *See Jakoski v. Holland,* 520 P.2d 569, 573 (Alaska 1974).

12. The State of Alaska was an original defendant in this action but the claims against the State were dismissed shortly before trial.

13. The total money judgment for Rule 82 purposes includes the verdict and prejudgment interest. *ERA Helicopters, Inc. v. Digicon Alaska, Inc.,* 518 P.2d 1057 (Alaska 1974).

14. KAL argues that its actual fees from up to and including trial were $172,582. They argue that if Motorola's costs were similar, then the award of $305,358.70 greatly exceeded Motorola's actual fees.

Under Alaska Civil Rule 82(a)(1), an award of attorney's fees to the prevailing party is committed to the broad discretion of the trial court, and will be set aside only if manifestly unreasonable. *Haskins v. Shelden,* 558 P.2d 487, 495 (Alaska 1976); *Alaska Placer Co. v. Lee,* 553 P.2d 54, 63 (Alaska 1976); *Dale v. Greater Anchorage Area Borough,* 439 P.2d 790, 793 (Alaska 1968).

We conclude that given the length, complexity and international dimension of the case, Judge Hunt did not err in awarding attorney's fees by applying the Rule 82(a)(1) schedule to the money judgment. We therefore affirm the court's award of attorney's fees.

The judgment of the superior court is AFFIRMED.[15]

**15.** The issues raised on cross-appeal are rendered moot by our disposition of this appeal.