ALASKA TAE WOONG VENTURE, INC., d/b/a Allegiance Trust Corp., Appellant and

Cross–Appellee,

v.

WESTWARD SEAFOODS, INC., Appellee and

Cross–Appellant.

Nos. S–7692/7711.

Supreme Court of Alaska.

Aug. 28, 1998.

Rehearing Denied Sept. 23, 1998.

Richard H. Friedman, Friedman, Rubin & White, Anchorage, and Jeffrey M. Feldman and Susan Orlansky, Young & Feldman, Anchorage, for Appellant/Cross–Appellee.

Jon S. Dawson, Davis, Wright, Tremaine, LLP, Anchorage, for Appellee/Cross–Appellant.

Before EASTAUGH, FABE and BRYNER, JJ.

*OPINION*

BRYNER, Justice.

## I. *INTRODUCTION*

In 1990, Alaska Joint Venture Seafoods, Inc. (AJVS), a commercial fishing company, and Westward Seafoods, Inc. (Westward), a seafood processor, agreed that, beginning in 1991, AJVS would deliver its catch of crab and pollock to a new processing plant that Westward was building on Unalaska Island. AJVS expected to deliver crab beginning on January 15, 1991, but Westward's new plant was not completed until mid-March. The unexpected delay caused AJVS to sustain financial losses. Alaska Tae Woong Venture (ATWV), as assignee of AJVS's cause of action against Westward, sued Westward for AJVS's losses, claiming misrepresentation and breach of contract. The trial court found the misrepresentation claim time-barred and dismissed it. A jury returned a verdict in favor of AJVS on the breach of contract claim. After reducing the verdict, the trial court entered judgment for ATWV.

ATWV appeals, asserting that the court erred in reducing its verdict and in striking its fraud claim. Westward cross-appeals, claiming that there was insufficient evidence to prove a contract and that the court committed prejudicial error in admitting evidence of Westward's misrepresentations.

We find ATWV's challenge to the reduction of its verdict meritorious in part but hold that its misrepresentation claim was properly dismissed. We reject Westward's arguments on cross-appeal, finding that the jury heard sufficient evidence to find that a contract existed and that any error in admitting evidence of Westward's misrepresentations was harmless.

## II. *FACTS AND PROCEEDINGS*

Alaska Joint Venture Seafoods, Inc., was formed in 1987 by William Phillips and Thorne Tasker. Phillips, an attorney, handled the business end of the enterprise. Tasker, an experienced fisherman, handled "the fishing side of the thing." Initially, the company functioned primarily as a management company for fishing vessels, and provided a link between Alaska fishers and foreign processors. It also owned fishing vessels of its own. In 1989, AJVS acquired the fishing vessel Duffy Sea, which it later renamed the Allegiance. AJVS put the boat to use in the Bering Sea as a crabber

in January 1990. It planned to convert the boat to allow it to bottom fish as well.

Westward Seafoods, Inc., a seafood processor, entered into an agreement with AJVS for the Duffy Sea's king crab catch; in exchange, Westward was to provide the Duffy Sea with a market for its pollock catch. Evidence at trial suggested that Westward was primarily interested in securing the Duffy Sea's catch of king crab, whereas AJVS wanted a secure market for opilio crab and pollock, as well. In the Bering Sea fisheries, king crab is a valuable species and processing plants have enough capacity to process all of the king crab that can be caught during a given season. As a consequence of this capacity/supply situation, processors desire commitments from fishing vessels to deliver all the king crab they catch. By contrast, fishers are able to supply more opilio crab and pollock (a bottom fish) than the processors can handle; they therefore desire commitments from processors to purchase these crab and fish.

The Westward plant to which the Duffy Sea was to take its catch was located in Captains Bay on Unalaska Island and was still under construction during negotiations between AJVS and Westward. Westward represented that the plant was scheduled to open and would be able to take crab from the Duffy Sea beginning on or about January 15, 1991.

The January start-up date for Westward's new plant was mentioned several times in the correspondence confirming the parties' agreement. The parties initially negotiated for AJVS to supply Westward with crab and pollock from two vessels, the Optimus Prime and the Duffy Sea. On June 11, 1990, Westward's president, Hugh Reilly, wrote to AJVS's chairman, Thorne Tasker, confirming this agreement:

> Pursuant to our recent conversations in Tokyo and Seattle, we are writing to confirm our agreement that your F/V's OPTIMUS PRIME and DUFFY SEA will join the fleet of vessels dedicated to the supply of Pollock and crab to the new plant which we are currently constructing at Captains Bay on Unalaska Island, Alaska.

> Based upon our agreement, Westward will rely upon your two vessels to commence deliveries to the plant coincident with the plant's start-up for commercial operations—currently scheduled for January 1991.

Over the course of the summer, this two-vessel agreement evolved into an agreement involving only the Duffy Sea. In August 1990, AJVS informed Westward that its original plan to convert the Optimus Prime for use in the pollock fishing venture did not appear economically feasible. AJVS nonetheless assured Westward that, under the agreement memorialized in Westward's June 11 letter, "it would be our responsibility to find a suitable replacement" and that "AJVS is ready to go ahead with its delivery schedule for Westward Seafoods' new plant." AJVS asked Westward to "confirm that our market is secure."

By mid-September, AJVS had evidently abandoned the idea of a replacement vessel and had focused on the Duffy Sea to supply Westward. AJVS informed Westward that it planned to convert the vessel to make it suitable for use in both the crab and pollock fisheries. On September 17, AJVS asked Westward to "reserve a [pollock] market for us at the 500 ton per delivery level" beginning June 1, 1991.

On September 19, Westward replied that it was "pleased to confirm that we can provide a market for the [Duffy Sea] to deliver pollock to our Captains Bay plant from June 1, 1991." But Westward made it clear that its willingness to guarantee AJVS a market for its pollock depended on AJVS's willingness to commit all of the Duffy Sea's crab to Westward's new plant:

> As we have discussed, Westward's interest in providing this market opportunity to the DUFFY SEA is stimulated by the prospect of receiving dedicated deliveries of King and Tanner crab caught by the vessel, commencing with the 1990/91 crab season and continuing to include future crab seasons occuring [sic] when the pollock fishery is closed. This pollock market for the DUFFY SEA is contingent upon Westward Seafoods receiving such deliveries.

The next day, AJVS advised Westward that, although AJVS had already committed its 1990 king crab to another processor, it was prepared to commit all of the Duffy Sea's crab and pollock production to Westward beginning January 15, 1991:

> We are prepared to commit the crab production from the DUFFY SEA to Westard [sic] Seafoods as well [as pollock], although it was our understanding that you would not be processing king crab this year at the plant. We have made commitments for the king and boridi [sic, bairdi] crab production from the DUFFY SEA for 1990, but can commit all crab to your plant beginning with opilio crab on January 15, 1991. Given the present configuration of seasons, we would fish opilio crab for the first few months of 1991, then take the vessel into the shipyard for conversion work returning for pollock fishing on June 1, 1991. At the conclusion of pollock in the Fall, we would return to crab through the end of the year. In 1992, we would open with pollock until the roe fishery closes and fish crab until pollock re-opens in June.

Westward replied on September 25:

> Thank you for your fax of the 21st regarding the DUFFY SEA's Pollock and Crab market at Westward Seafoods. Your enthusiasm for this employment is most welcome.
>
> . . . .
>
> Your commitment[s] for the 1990 King Crab season are noted; commencement of Opelio [sic] deliveries from Jan. 15, 1991 should fit well with our readiness to receive product; we will have to keep in touch as this date approaches.

AJVS regarded this series of correspondence as forming a binding commitment by Westward to begin accepting opilio crab from the Duffy Sea on January 15, 1991. As the January 15 start-up date approached, Westward continued to advise AJVS that this date remained viable. On November 23, 1990, for example, Westward sent AJVS a fax stating, "[t]entively [sic], we will be ready for crab on Jan 15, '90 [sic] and could use the vessel at that time."

Without warning to AJVS, Westward failed to open the Captains Bay plant on schedule. In fact, it did not take crab until approximately March 20, 1991. As a result, AJVS was forced to try to locate alternative markets for the Duffy Sea's opilio crab. The lack of a committed market made it difficult to catch and sell crab efficiently. According to Tasker, the Duffy Sea caught and sold less crab that season than it would have with a steady processor.

Because of this disruption, AJVS faced the latter half of 1991 with a severe cash deficit. The company sought financing and began to sell assets. Ultimately, the company sold the Duffy Sea—by then renamed the Allegiance—because it could not afford to keep it. The buyer of the boat was AJVS Chairman Thorne Tasker. He placed the Allegiance in Alaska Tae Woong Ventures, Inc., another Tasker corporation. Tasker also assumed the vessel's mortgage and purchased all assets and liabilities relating to the boat, including its cause of action against Westward. Tasker paid AJVS $10,000 cash and his shares of stock in the company. William Phillips thus became the sole owner of AJVS.

Acting on its assignment of AJVS's cause of action, ATWV filed suit against Westward in 1993. The complaint alleged that Westward had breached its contract to accept crab from AJVS beginning January 15, 1991. ATWV sought lost profits for the 1991 crab season and subsequent seasons on the theory that Westward caused AJVS to lose the Allegiance and its attendant profit-making ability. It also sought recompense for an alleged loss on the sale of the Allegiance.

During pretrial depositions and document discovery in 1995, ATWV discovered what it considered to be evidence showing that Westward had intentionally misinformed AJVS concerning the opening date of its Captains Bay plant. Specifically, ATWV found correspondence between Westward and its contractors indicating that Westward knew as early as August 1990 that construction on the plant was substantially behind schedule and that the plant would not open by January 15, 1991.

Upon discovering this correspondence, ATWV amended its complaint to include a claim of intentional misrepresentation:

> Between September 19, 1990 and January 18, 1991, plaintiff received repeated assurances from Westward that its Plant's [sic, Captains] Bay Plant would be open in time for the January, 1991 crab season. In fact, when it made those promises and assurances to plaintiff, Westward knew that its Plant's [sic] Bay Plant would not be open in time for the start of the January crab season.

AJVS sought to recover punitive damages on this claim.

Westward moved for summary judgment as to the misrepresentation claim, asserting that it was barred by the statute of limitations. Prior to trial, the court granted partial summary judgment, dismissing the claim. The court also ruled that ATWV's claim for lost profits should be limited, as a matter of law, to profits lost up to the date of trial.

At trial, the central issues were whether Westward actually contracted to begin accepting AJVS's deliveries on January 15, 1991; if so, whether Westward breached this contract; and, if it did, what damages it owed for its breach. The jury returned a verdict finding that there was a contract, that Westward breached the contract, that AJVS's lost profits for the 1991 season were $568,964, and that AJVS's lost profits from 1992 to the date of trial were $1,794,356. The jury also found that AJVS suffered no loss in selling the Allegiance to Tasker.

Westward moved in the alternative for judgment notwithstanding the verdict or a new trial. The trial court denied the motion for a new trial, but granted a JNOV on the award of lost profits from 1992 to the date of trial, striking those damages entirely. The court also ordered a remittitur of the award of damages for the 1991 season to $315,-934.38.

ATWV appeals; Westward cross-appeals.

**1.** A "variable cost" is a cost that varies with the level of operations, as opposed to costs that are

## III. DISCUSSION

### A. ATWV's Appeal

#### 1. Did the trial court err in ordering a remittitur?

One of ATWV's damages witnesses, Dr. Paul Taylor, testified that, for the years 1990 and 1991, the Allegiance generated a net annualized average cash flow from crab fishing of $568,964. This figure did not represent an estimate of lost revenues or lost profits. Dr. Taylor estimated that AJVS lost $221,532 in revenues because of the fishing trips that Westward's breach caused the Allegiance to miss in 1991. Dr. Taylor also estimated the Allegiance's "variable costs" [1] to be 54.3% of its lost revenues; deducting this percentage from the Allegiance's 1991 lost revenues yields a lost profits estimate for the 1991 season of $101,240.

The jury awarded $568,964 for AJVS's 1991 lost profits; this is the precise figure Dr. Taylor attributed to net annualized average cash flow.

Westward objected to the award, arguing that it reflected the jury's misunderstanding of Dr. Taylor's testimony. In response to this objection, the trial court ordered a remittitur to $315,934.38, finding that "[t]he record does not contain evidence to support the $568,964 award." The court agreed with Westward's assertion that the jury had confused cash flow with lost profits.

In calculating the amount of the remittitur, the court began by noting that Dr. Taylor, in his testimony, estimated that the Allegiance had lost a total of $691,322.50 in revenues during the 1991 crab season. The court accepted this figure as the highest estimate of lost revenue supported by the evidence. Using Dr. Taylor's variable cost figure, the court deducted 54.3% of the lost revenue estimate, thereby arriving at $315,934.38 ($691,322.50 × 45.7%) as the maximum amount of lost profits supported by the evidence.

ATWV contends on appeal that the trial judge erred in ordering a remittitur on the 1991 lost profits award.

fixed and do not vary, no matter what the level of operations is.

We review an order of remittitur for abuse of discretion. *See Exxon Corp. v. Alvey,* 690 P.2d 733, 743 (Alaska 1984). However, a remittitur may not reduce an award below the maximum possible award supported by the evidence. *See id.* at 742. Because of this limitation on the scope of a remittitur, we must inquire whether any evidence in the record could support a jury award of $568,964.

ATWV relies on testimony by William Phillips and other witnesses indicating that, but for Westward's breach of contract, the Allegiance could have generated as much as $600,000 or $700,000 in additional revenues during the 1991 season. ATWV argues that almost all of this revenue would have become profit.

This argument is consistent with evidence ATWV presented at trial. William Phillips testified, for example,

> [I]f you have a contract, the scheduling of the boats is set up in such a way to where you can go out and fish for 30 hours … fill your boat, and come in and you have a scheduled time when you can make a delivery.… [A]nd turnaround time is where you make your money. If you don't have a contract, what you end up having to do is sit at the dock … with fish in your hold.

He also testified, "[Y]ou have a certain fixed cost in this business and that extra production [that was lost] is where you make your profit." Thorne Tasker further testified that the Allegiance could not fish "full speed, without knowing when you were going to deliver."[2] ATWV presented this theory of lost efficiency in both its opening statement and its closing argument.

Relying on the foregoing evidence, ATWV concludes:

> Because evidence allowed the jury to infer that AJVS had incurred all the expenses it would have incurred had Westward not breached the contract, the jury consequently could find it was not necessary to deduct any additional expenses

from the lost income in order to determine AJVS' lost profits for the season. From the testimony of Phillips and the other witnesses, the jury reasonably could infer that virtually all of the income lost would have been profit to AJVS.

Westward counters that "[t]here was no evidence suggesting that AJVS could have made … additional trips without incurring additional costs." In Westward's view, "[w]ithout such evidence, it would have been purest speculation … for the jury to award the full amount of lost revenues without subtracting costs." Westward cites *City of Palmer v. Anderson,* 603 P.2d 495, 500 (Alaska 1979), which holds:

> In order to recover lost profits in a breach of contract action, the plaintiff must present to the jury evidence sufficient to calculate the amount of the loss caused by the breach. The plaintiff need not prove the amount of damages with exact detail, but the evidence must be sufficient to provide a reasonable basis for the jury's determination.

Westward's argument is unpersuasive. Given ATWV's strong showing that Westward's breach caused AJVS substantial actual harm, the lack of certainty as to AJVS's margin of profit on its revenues has relatively minor importance:

> Once the fact of damages has been proven to a reasonable probability, the *amount* of such damages, on the other hand, need only be proven to such a degree as to allow the finder of fact to "reasonably estimate the amount to be allowed for [the] item [of damages]."

*Pluid v. B.K.,* 948 P.2d 981, 984 (Alaska 1997) (quoting *Blumenshine v. Baptiste,* 869 P.2d 470, 473 (Alaska 1994)); *see also Power Constructors, Inc. v. Taylor & Hintze,* 960 P.2d 20, 43–44 (Alaska 1998).

Here, jurors viewing the evidence in the light most favorable to ATWV could reasonably have concluded that Westward's breach caused AJVS as much as $700,000 in lost revenue during the 1991 crab season and that

---

**2.** Even Dr. Taylor, who supplied the 54.3% variable cost figure, agreed that the Allegiance had suffered a loss of efficiency in 1991. Dr. Taylor felt that he could not directly calculate how that loss affected the variable cost, but appeared to acknowledge that his lost revenue figure would rise if the lost efficiency could be calculated.

a large proportion of this loss consisted of profits. Because there was sufficient evidence to allow reasonable jurors to find that AJVS probably lost at least $568,964 in profits during 1991, the jury's actual award in this amount should not have been disturbed. *See Zerbetz v. Municipality of Anchorage,* 856 P.2d 777, 784 (Alaska 1993). We therefore conclude that the trial court erred in ordering a remittitur.

### 2. *Did the trial court err in granting a JNOV for the lost profits from 1992 to the time of trial?*

#### a. *AJVS's transfer of the Allegiance*

The jury awarded ATWV almost $1.8 million in lost profits from January 1992 to the time of trial. This award covered the period after AJVS sold the Allegiance to Tasker. ATWV's theory of damages as to this period was that Westward had destroyed AJVS's cash flow through its breach of contract, forcing it to sell the Allegiance; as AJVS was in no position to obtain financing to replace the Allegiance, the company suffered losses through its inability to fish in subsequent seasons.

The jury was instructed to award foreseeable damages of this type by figuring "revenues minus costs that AJVS would have received for the specified period of loss of use, if the Allegiance had been available to it for fishing." The jury was further instructed that it could award lost-profits damages "for the period of time up until AJVS reasonably should have been able to replace the Allegiance. In ascertaining how long this period of time is, you may consider ... AJVS' financial ability to obtain a replacement." After trial, the court granted Westward's motion for a JNOV regarding these damages.

■ ATWV appeals the court's decision to grant a JNOV. In reviewing a directed verdict or JNOV, this court does not "weigh conflicting evidence or judge the credibility of witnesses." *Ben Lomond, Inc. v. Schwartz,* 915 P.2d 632, 635 (Alaska 1996). Rather, it "determine[s] whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable persons could not differ in their judgment as to the facts." *Id.* But when, as

here, the trial court chooses among competing legal theories in making its ruling, we review its choice of theory *de novo. See Cummings v. Sea Lion Corp.,* 924 P.2d 1011, 1022–23 n. 18 (Alaska 1996).

The trial court based its JNOV on the nature of the "sale" that occurred after Westward's breach. Specifically, the court found that

> AJVS did not *sell* the Allegiance ... to pay off its loan or otherwise obtain cash to continue operations. Mr. Tasker and Mr. Phillips, the owners of AJVS, simply *divided up* the assets and liabilities of the corporation. The parties together possessed 100% of the properties owned by AJVS. After dissolution of their partnership, each owned 50% of the these [sic] properties (or their net values). There was no net loss— merely a division.

The court also referred to Jury Instruction 23, which told the jury to consider the "market availability of a replacement" for the Allegiance when determining lost profits. The court found that "[t]his 'replacement' standard logically applies to situations in which a third party has destroyed a chattel needed to generate profits. But it makes no sense in the context of a plaintiff corporation which has voluntarily spun off another business entity and allocated the 'lost' property to that new operation." Thus, the court concluded that there could be no lossof-use damages when there was no loss of the Allegiance.

■ ATWV argues that the "trial court erred when it found that AJVS did not *sell* the Allegiance.... The undisputed testimony was that AJVS *sold* the Allegiance to Tasker in exchange for his shares in AJVS, *plus* his shares in *other* corporations, and $10,000 cash." ATWV further notes that "Phillips and Tasker were not partners; they were co-shareholders in AJVS."

ATWV's argument has merit. The trial court's ruling rests on an implicit finding that the evidence at trial was insufficient to establish that AJVS's transfer of the Allegiance to Tasker was a true sale. This finding would be justified only if no reasonable juror could find that the transfer was an arm's length

transaction foreseeably caused by Westward's breach of contract. *See Ben Lomond,* 915 P.2d at 635. Although the trial court described Phillips and Tasker's transaction as a division of partnership assets, it is undisputed that AJVS was a corporation, not a partnership. Ample evidence was presented at trial to support a finding that the transaction was a sale. Further, there was testimony that AJVS was forced to sell the vessel to Tasker because of Westward's breach of contract. Finally, Westward did not claim or show that the sale involved collusion or fraud.

Given this evidence, the trial court erred in ruling as a matter of law that AJVS did not sell the Allegiance to Tasker. It follows that the court also erred in relying on this finding as a basis for striking the jury award for lost future profits.

### b. *Foreseeability of selling the Allegiance*

■ The trial court further found that, although Westward arguably could have foreseen that its breach of contract might have resulted in forcing AJVS to sell the Allegiance, it could not have foreseen the "restructuring of the business arrangements between the two partners" that actually occurred. Westward advances the court's finding of unforeseeability as an alternative basis for affirming the court's decision granting Westward a JNOV on ATWV's claim for post–1991 lost profits.

■ But the court premised its finding of unforeseeability on its conclusion that the transfer was not a true sale. We have already held that this conclusion was erroneous. Moreover, foreseeability is a fact question for the jury. *See Native Alaskan Reclamation & Pest Control, Inc. v. United Bank Alaska,* 685 P.2d 1211, 1218 (Alaska 1984). The evidence at trial showed that Westward knew of AJVS's financial situation when it entered into the contract. This evidence could support a finding that Westward knew or should have known that AJVS's loss of its market for opilio crab might result in financial difficulties causing the company to transfer the Allegiance. Foreknowledge of the exact form the transfer might take was immaterial. The trial court's decision to strike all post–1991 lost profits cannot be sustained on the ground of insufficient evidence of foreseeability.

### c. *Limitation on ATWV's lost profits*

The trial court, "by way of *dictum,*" reached an alternative conclusion. The jury awarded ATWV lost profits for the 1991 season and for eight subsequent six-month fishing periods, beginning in January 1992. The court, positing that ATWV might be entitled to an award of some post–1991 lost profits if the transfer of the Allegiance were truly a foreseeable loss, concluded that ATWV's lost profits should be limited as a matter of law to profits lost through June 1993. The court found:

> At the time of contracting, neither Westward nor AJVS could have foreseen the probability that AJVS' losses would be perpetuated through numerous seasons. Westward could not have anticipated; on a more likely than not basis, what position AJVS would be in vis-a-vis the fishing industry three seasons later.... Accordingly, lost profits damages would have to be limited to damages incurred through 6/30/93.

For this conclusion, the court cited *State v. Stanley,* 506 P.2d 1284 (Alaska 1973).

ATWV correctly points out that in *State v. Stanley,* we found as a matter of fact, not as a matter of law, that an eighteen-month limit on loss-of-use damages was justified. *See id.* at 1293. ATWV argues that *Stanley* does not hold that loss-of-use damages may be limited as a matter of law; ATWV further argues that, because the evidence at trial supported the jury's award of lost profits beyond June 1993, limiting loss-of-use damages in the present case cannot be justified as a matter of fact.

But these distinctions are not determinative. We have previously adopted section 351 of the Restatement (Second) of Contracts. *See Native Alaskan Reclamation,* 685 P.2d at 1219, 1222. The Restatement empowers trial courts to limit damages for foreseeable loss when "justice so requires in order to avoid disproportionate compensation." Restatement (Second) of Contracts

§ 351(3) (1981).[3] The comment to section 351 notes that "[t]ypical examples of limitations imposed on damages under this discretionary power involve the denial of recovery for loss of profits." *Id.* at cmt. f; *see also Stanley,* 506 P.2d at 1293.

 Our review of the record convinces us that section 351 authorized the trial court to impose a reasonable legal limit on ATWV's claim of lost future profits. ATWV did not assert that Westward's breach of contract destroyed AJVS; selling the Allegiance did not put AJVS out of business. Soon after the sale, Phillips wound down the company's business. But his action appears to have been voluntary, not dictated by AJVS's economic failure; the company evidently was not insolvent at the time. And, to the extent that Phillips acted for financial reasons, the record indicates that his actions stemmed in part from problems unrelated to Westward's breach.

By electing to stop actively engaging in business, AJVS effectively chose to make no further effort to earn *any* profits—including profits it might have earned through reinvestment of the consideration it received for selling the Allegiance. Had the company continued in business and reinvested the proceeds from the Allegiance's sale, its profits on that investment would presumably have reduced losses it suffered as a result of the vessel's absence. In light of this election, it seems anomalous for ATWV now to claim entitlement to seemingly endless years of profits that AJVS might have earned.

ATWV does not explain how such compensation would be just. AJVS's inability to replace the Allegiance cannot alone support a finding of long-term losses. *See Persinger v. Lucas,* 512 N.E.2d 865, 868–69 (Ind.App. 1987) (holding that financial difficulties standing alone do not warrant an indefinite extension of damages). Moreover, because ATWV does not claim that Westward caused AJVS's destruction, the causal nexus between Westward's breach and AJVS's loss of future earnings is necessarily uncertain. *Cf.*

*City of Whittier v. Whittier Fuel & Marine Corp.,* 577 P.2d 216, 223 (Alaska 1978) (stating that proof of future profits entails two aspects of certainty: certainty as to amount and certainty as to causation). Finally, no matter how predictable it was that Westward's breach would cause AJVS to lose the Allegiance, it strains credulity to think that Westward could reasonably have anticipated perpetual liability for profits AJVS might lose in future years.

 Given these circumstances, we conclude that an extended award of lost profits would be disproportionate to Westward's breach; justice does not require such compensation. *See* Restatement § 351(3). Accordingly, we hold that the trial court did not err in its alternative decision to preclude ATWV from claiming lost profits beyond June 30, 1993. Our conclusion that the trial court did not err in so limiting lost profits necessarily disposes of ATWV's claim that the court erred in precluding evidence of lost profits beyond the time of trial. We likewise reject Westward's claim that the jury's finding that AJVS received fair market value for the sale of the Allegiance barred ATWV from any claim for future lost profits. Even assuming that the jury verdict can be construed as a finding that AJVS received fair market value for the Allegiance, this finding would not be factually or legally inconsistent with ATWV's contention that AJVS was unable to secure a replacement vessel and thus suffered lost profits.

3. *Did the trial court err in granting partial summary judgment to Westward on ATWV's misrepresentation claim?*

 a. *The statute of limitations*

 During discovery, it came to light that Westward may have intentionally misrepresented to AJVS the opening date of its plant. As a result, in August 1995 — more than four years after the alleged breach of contract — ATWV amended its complaint to

---

**3.** This subsection provides:

A court may limit damages for foreseeable loss by excluding recovery for loss of profits, by allowing recovery only for loss incurred in reliance, or otherwise if it concludes that in the circumstances justice so requires in order to avoid disproportionate compensation.

include a tort claim for intentional misrepresentation. Westward moved for summary judgment on statute of limitations grounds. Apparently agreeing with Westward that the two-year tort statute of limitations — rather than the six-year contract statute — applied, the trial court granted the motion. ATWV argues that the court erred.[4]

■■■■ Alaska Statute 09.10.050 is the statute of limitations applicable to contract actions. It states in pertinent part that "[u]nless the action is commenced within six years, a person may not bring an action (1) upon a contract or liability, express or implied." By contrast, the tort statute of limitations, AS 09.10.070(a)(1), provides:

> A person may not bring an action ... for any injury to the person or rights of another not arising on contract and not specifically provided otherwise ... unless the action is commenced within two years.

ATWV contends that its misrepresentation action arises out of a contract and that, therefore, the six-year statute applies. In support of this argument, it refers to our opinions in *Lee Houston & Associates, Ltd. v. Racine*, 806 P.2d 848 (Alaska 1991), and *Breck v. Moore*, 910 P.2d 599 (Alaska 1996).

In *Lee Houston*, we held that the six-year statute of limitations governed a suit arising out of a breach of duty imposed by a professional services contract both because "the duty allegedly breached *does* in part arise from the contract," and because a longer limitations period for actions involving economic harm rather than "personal, reputational or dignitary injuries" is consistent with the purpose of statutes of limitations. 806 P.2d at 854–55. ATWV urges us to apply the reasoning of *Lee Houston* to this case; ATWV contends that Westward's alleged misrepresentation both caused AJVS economic loss and arose in connection with the contract between AJVS and Westward.

A footnote from *Lee Houston* answers this contention:

> An example of a claim not involving a personal, reputational or dignitary injury

(i.e., involving economic loss), and not arising on contract, would be a claim of fraud or misrepresentation not based on fiduciary duties owed by a contracting party. *Id.* at 854 n. 13; *see also Bauman v. Day*, 892 P.2d 817, 825 (Alaska 1995) (holding that claims for fraud and misrepresentation are tort claims, and thus are subject to the two-year statute of limitations).

Accordingly, we conclude that the trial court did not err in finding the two-year statute applicable.

### b. The discovery rule

ATWV argues, however, that even if its misrepresentation claim is subject to the two-year statute, the discovery rule tolled the statute until 1995, when ATWV found affirmative proof that Westward had knowingly misrepresented the opening date of its Captains Bay plant.

We may assume that AJVS had not been aware of a knowing misrepresentation by Westward and that ATWV first recognized the possibility of a knowing misrepresentation when it began pretrial discovery on its contract claim. We have, however, held that the discovery rule does not require actual notice of misrepresentation:

> Where the plaintiff does not actually know of the existence of elements essential to her cause of action, under the "discovery rule," the limitations period does not begin to run until "a reasonable person [in like circumstances would have] enough information to alert that person that he or she has a potential cause of action or should begin an inquiry to protect his or her rights."

*Lee Houston*, 806 P.2d at 851 (quoting *Mine Safety Appliances Co. v. Stiles*, 756 P.2d 288, 291 (Alaska 1988)).

■■■■ In the present case, the evidence fully supports the trial court's conclusion that AJVS was placed on inquiry notice when, despite Westward's repeated assurances to the contrary, the Captains Bay plant failed to open on schedule. In *City of*

---

4. We review the superior court's grant of summary judgment *de novo*. This court determines whether any issues of material fact exist and whether the moving party is entitled to judgment as a matter of law. *See Bauman v. Day*, 892 P.2d 817, 824–25 (Alaska 1995).

*Fairbanks v. Amoco Chemical Co.*, 952 P.2d 1173, 1179–80 (Alaska 1998), we held that, under AS 09.10.120's special provision for actions involving fraud against the state and its political subdivisions, actual notice of scienter is required to trigger the running of the statute of limitations. We nevertheless emphasized that "[e]vidence of scienter is usually circumstantial"; that "[n]otice of the scienter element could not require knowledge of conclusive evidence"; and that the required knowledge "is simply the discovery of facts that are evidence of the defendant's state of mind, i.e., evidence the defendant knew the representation was false when made." *Id.* at 1179–80.

Even assuming that this same scienter requirement applies under the discovery rule governing the ordinary tort statute of limitations, we conclude that a finding of actual notice would be justified here. As Westward argues, not only did its plant fail to open on January 15, "[t]he plant did not open [on] February 1, either. Indeed, despite alleged assurances that the opening of the plant was imminent . . . the plant did not open until March. . . . By this time, the plaintiff had suffered serious losses as a result of Westward's alleged misrepresentations." The plant's continuing failure to open despite Westward's repeated assurances to the contrary amounts to strong circumstantial evidence that Westward knew its representations were false when it made them.

We find no error in the trial court's dismissal of ATWV's misrepresentation claim.

### B. *Westward's Cross–Appeal*

#### 1. *Sufficiency of the evidence*

At trial, Westward, arguing that there was insufficient evidence to establish the existence of a contract to accept deliveries beginning January 15, 1991, moved for a directed verdict on this issue. The superior court denied the motion. Westward now argues that the trial court erred in allowing the jury to consider whether it had promised to accept deliveries starting on January 15, 1991. Westward contends that the evidence on this issue was insufficient.

"This court's role in reviewing a grant [or denial] of a motion for a directed verdict or JNOV is not to weigh conflicting evidence or judge the credibility of witnesses, but rather to determine whether evidence, when viewed in [the] light most favorable to the nonmoving party, is such that reasonable persons could not differ in their judgment." *Korean Air Lines Co. v. State*, 779 P.2d 333, 338 (Alaska 1989) (citing *Knight v. American Guard & Alert, Inc.*, 714 P.2d 788, 793 (Alaska 1986); *Dura Corp. v. Harned*, 703 P.2d 396, 402 (Alaska 1985); *Kavorkian v. Tommy's Elbow Room, Inc.*, 694 P.2d 160, 163 (Alaska 1985)).

Westward initially contends that the testimony of former AJVS chairman Thorne Tasker concerning his subjective understanding that AJVS and Westward had an agreement to start delivery on January 15, 1991, was inadmissible. According to Westward, without Tasker's inadmissible testimony, there was no evidence to establish that a contract had been formed as to the start-up date for delivery.

At trial, ATWV asked Tasker, without objection, if he "understood, as a part of the agreement, that [AJVS] would deliver [crab to Westward] as soon as they were open." Tasker replied, "That was the number one part of the component of the agreement." ATWV then asked Tasker, "As to the January 15 dates that are mentioned in these letters, going back and forth, what role did they play in the agreement, as you understood it?" Westward objected to this question. After the trial court overruled the objection, ATWV rephrased the question, and Tasker answered, as follows:

Q. In your mind, what was the significance of these repeated references to January 15?

A. That was because it would be a disaster for us to go to that point and not have them open for the opilio market. So they agreed that they would be open; we agreed that we would be there with the vessel, ready to fish. That's the reason why January 15—because that's the opening day of opilio season.

In support of its position that admission of this testimony was error, Westward cites

*Mullen v. Christiansen,* 642 P.2d 1345 (Alaska 1982), and *Peterson v. Wirum,* 625 P.2d 866 (Alaska 1981). In *Mullen,* we held that "self-serving testimony of the parties as to their subjective intentions or understandings is not probative evidence of whether the parties entered into a contract." 642 P.2d at 1350. In *Peterson,* we observed that "looking to [parties'] testimony as to their subjective intentions or understandings will normally accomplish no more than a restatement of their conflicting positions." 625 P.2d at 870 n. 6 (quoting *Day v. A & G Constr. Co.,* 528 P.2d 440, 444 (Alaska 1974)). Relying on the quoted passages, Westward concludes that the trial court's failure to exclude Tasker's subjective impressions amounted to an abuse of discretion.

ATWV responds that these cases do not "raise[] any issue about the admissibility of one party's testimony concerning his understanding of what the other party agreed to do. Indeed, it is hard to imagine a contract case proceeding through trial where the parties are not asked what they understood the terms of the contract to be." ATWV cites *Municipality of Anchorage v. Gentile,* 922 P.2d 248 (Alaska 1996), where, in approving the trial court's reliance on the testimony of various parties concerning their understanding of a contract, we said, "Alaska courts may use extrinsic evidence regarding the intent of the parties 'to interpret a contract regardless of whether the contract appears to be ambiguous on its face or not.' " *Id.* at 258–59 (quoting *Peterson,* 625 P.2d at 871; citing *Wright v. Vickaryous,* 598 P.2d 490, 497 n. 22 (Alaska 1979)).

■ ATWV's position is persuasive. Although Tasker, prompted by his lawyer, couched his answer to the disputed question in subjective language — stating what he understood the agreement to mean "[i]n [his] mind" — he explained his understanding in objective terms that were sufficiently detailed to enable the jury to form its own judgment as to the reasonableness of Tasker's interpretation and the likelihood that Westward would have the same understanding. There is nothing improper in such testimony:

[A] party should be permitted to determine the operative meaning of the words of agreement by proving that both parties so understood them, or that he so understood them and the other party knew that he did, or that he so understood them and the other party had reason to know that he did.

3 Arthur Corbin, *Corbin on Contracts* § 538, at 59–61 (1960).

Westward further argues that no rational juror could have found, based on the communications between AJVS and Westward in 1990, that Westward made a binding promise to begin accepting delivery of crab from AJVS on January 15, 1991. According to Westward, the parties' correspondence does nothing more than show that Westward "predict[ed]" that it would be ready to receive deliveries on January 15. In support of its argument, Westward cites cases holding that "a projection or expression of expectation is not a promise."

Westward's argument misses the mark. It is not only the written correspondence that must be taken into account, but the entire body of evidence regarding reported conversations between the parties, the parties' conduct, and all circumstances surrounding the negotiation. *See Gentile,* 922 P.2d at 256. As noted above, this court does not reweigh the evidence; rather, we must draw all inferences against the moving party. *See Korean Air Lines Co.,* 779 P.2d at 338. Viewed in the light most favorable to ATWV, the totality of the evidence suffices to allow reasonable jurors to find that Westward did in fact promise to begin accepting AJVS's deliveries on January 15, 1991. The trial court did not err in denying Westward a directed verdict on this point.

### 2. Evidence of Westward's misrepresentations

Westward argues that the superior court erred in allowing ATWV to introduce evidence of Westward's misrepresentations concerning the opening date of its processing plant.

Although the court ruled prior to trial that ATWV's misrepresentation claim was time-barred, it expressly reserved ruling on the

issue of whether Westward's alleged misrepresentations might support an award of punitive damages on ATWV's breach of contract claim. At trial, ATWV was initially allowed to introduce evidence of Westward's misrepresentations in order to support its request for punitive damages. After hearing ATWV's case, however, the trial court decided that this evidence could not support an award of punitive damages. It thus struck ATWV's punitive damages claim.

In light of this ruling, Westward asked the court to instruct the jury to disregard all previously admitted evidence relating to its alleged misrepresentations. In response, ATWV argued that the evidence remained relevant to the credibility of Westward's witnesses. The court agreed; it instructed the jury that, although ATWV's misrepresentation allegations were no longer at issue, the jury could consider the evidence of misrepresentations as it related to witness credibility and the existence of a contract between the parties.

Westward argues that this evidence was inadmissible to impeach witness credibility. Westward cites Alaska Rule of Evidence 608(b), which generally prohibits the use of specific instances of conduct to support or attack witness credibility except on cross-examination of a character witness.[5] Westward also argues that the disputed evidence was irrelevant and, even if relevant on issues other than credibility, had a prejudicial impact clearly outweighing any probative value.

■ Westward's reliance on Rule 608(b) is largely misplaced. The disputed misrepresentation testimony tended to shed light on the credibility of Westward's witnesses not by reflecting negatively on their character for truthfulness — the use prohibited by Rule 608(b) — but by refuting specific factual assertions in their testimony, a use that has nothing to do with proof of character for untruthfulness.

Moreover, the central issue in this case was whether the parties had formed a contract for delivery of crab beginning January 15, 1991. The parties' course of dealings after entering into the alleged contract was potentially vital evidence of whether they in fact believed that they had entered a binding contract. "The jury could properly consider the language and conduct of the parties, the objects sought to be accomplished, and the circumstances surrounding the negotiation of the contract to determine whether [a contract existed]." *Mullen*, 642 P.2d at 1349.

■ Finally, assuming that admission of the challenged evidence was more prejudicial than probative, *see* Alaska R. Evid. 403, this evidence played a small role in a lengthy trial and was not inherently inflammatory. Westward did not move for a mistrial, and the trial court gave an appropriate instruction limiting the jury's use of the evidence. We find nothing to suggest that the jury disregarded the instruction. Any error in admitting the disputed evidence had no appreciable effect on the jury's verdict and was therefore harmless.

## IV. CONCLUSION

We VACATE the judgment and REMAND this case for entry of an amended judgment conforming with this opinion.

MATTHEWS, C.J., and COMPTON, J., not participating.

---

**5.** Alaska Rule of Evidence 608(b) reads:

If a witness testifies concerning the character for truthfulness or untruthfulness of a previous witness, the specific instances of conduct probative of the truthfulness or untruthfulness of the previous witness, may be inquired into on cross-examination. Evidence of other specific instances of the conduct of a witness offered for the purpose of attacking or supporting that witness' credibility is inadmissible unless such evidence is explicitly made admissible by these rules, by other rules promulgated by the Alaska Supreme Court or by enactment of the Alaska Legislature.