*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JOEL G. WIERSUM and DARLENE WIERSUM, | ) ) ) | Supreme Court No. S-14304 |
| Appellants, | ) ) | Superior Court No. 3KO-08-00064 CI |
| | ) ) | O P I N I O N |
| PAUL R. HARDER and LISA W. WIETFELD, | ) ) ) | No. 6815 – August 23, 2013 |
| Appellees. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kodiak, Steve W. Cole, Judge.

Appearances: Alexander O. Bryner, Feldman Orlansky & Sanders, Anchorage, for Appellants. Jill C. Wittenbrader, Law Office of Jill Wittenbrader, LLC, Kodiak, for Appellee Harder. Gregory S. Hunt, Bliss, Wilkens & Clayton, Anchorage, for Appellee Wietfeld.

Before: Fabe, Chief Justice, Carpeneti, Winfree, Stowers, and Maassen, Justices.

PER CURIAM.
FABE, Chief Justice, concurring.
CARPENETI, Justice, with whom WINFREE, Justice, joins, concurring in part and dissenting in part.
WINFREE, Justice, concurring in part and dissenting in part.
STOWERS, Justice, with whom MAASSEN, Justice, joins, concurring in part and dissenting in part.

## I.    INTRODUCTION

This appeal arises out of a timber trespass action. Paul Harder brought a lawsuit seeking restoration damages against Joel and Darlene Wiersum after the Wiersums cleared trees from Harder's property without his permission. The Wiersums filed a third-party complaint against Harder's sister, Lisa Wietfeld. They sought to apportion fault to Wietfeld, claiming that she had negligently misrepresented that she owned the property where the trees were cut when she gave them permission to remove trees from her property. The superior court granted Wietfeld's summary judgment motion and dismissed the claim against her. The remaining parties proceeded to trial and a jury awarded Harder $161,000 in compensatory restoration damages. The jury also found that Harder was entitled to statutory treble damages. The superior court denied the Wiersums' motions for a directed verdict and judgment notwithstanding the verdict.

The Wiersums appeal, arguing that the superior court erred by dismissing their claim against Wietfeld and by denying their motions for directed verdicts and judgment notwithstanding the verdict. Because we conclude that Wietfeld owed no duty to Harder, we affirm the superior court's grant of summary judgment as to Wietfeld. We also affirm the superior court's denial of the Wiersums' motions for a directed verdict because Harder presented sufficient evidence for the issue of restoration costs to be submitted to the jury. We conclude, however, that the superior court erred by denying the Wiersums' motion for judgment notwithstanding the verdict because the jury's award of restoration damages was objectively unreasonable. We therefore vacate the damages award and order a new trial on damages.

## II. FACTS AND PROCEEDINGS

### A. Facts

Paul Harder bought land in the Monashka area of Kodiak in 1976. He built a small home on the property in 1981 and lived there for several years. In 1982 he subdivided the property into three lots: Lots 1A, 1B, and 1C.

In 1993 Harder sold Lot 1B, where his house stood, to his sister, Lisa Wietfeld. Over the next 15 years, Harder lived in Washington and Hawaii with his family. He periodically returned to Kodiak to fish and visit the Monashka property. He testified that he intended to build a home on Lot 1A in the future, as this was his favorite area of the property.

In 2002 the Wiersums bought property adjacent to Lot 1A (Harder's property), which overlooks Lot 1B (Wietfeld's property). The Wiersums could see Wietfeld's cabin at the bottom of the hill below their property, and they assumed that Wietfeld owned all of the land between her house and their property.

In 2005 Darlene Wiersum called Wietfeld while Wietfeld was at work to ask if the Wiersums could cut down some trees on Wietfeld's property that might "come down with the wind" and harm their property. Wietfeld gave them permission because she thought the removal of some trees would "let a little more light in." When Wietfeld returned home from work later that day, she discovered that the entire hillside had been cleared. Upset by the number of trees that had been cut, Wietfeld immediately called the Wiersums and left a message instructing them not to cut any more trees. Harder next visited the property in 2007 and discovered the clear-cut hillside. He asked Wietfeld who had cut the trees and informed her that the trees were on his property, not hers.

**B.      Proceedings**

In March 2008 Harder brought a timber trespass claim against the Wiersums seeking restoration costs and treble damages under AS 09.45.730.[1] Harder asserted in his complaint that he had intended to let the land "remain in its natural state and planned to build a small cabin in the old growth forest for his retirement." In their answer, the Wiersums asserted that if they were liable for damages, fault must be apportioned to Wietfeld under AS 09.17.080.[2] They also filed a third-party complaint against Wietfeld, alleging that she had negligently misrepresented to the Wiersums that she owned the property belonging to her brother and again claiming that in the event Harder was entitled to damages, fault must be apportioned between themselves and Wietfeld under AS 09.17.080.

Harder filed a motion for partial summary judgment seeking to establish that he was entitled to treble damages under AS 09.45.730. The Wiersums opposed the motion, arguing that there was a genuine issue of material fact regarding application of one of the statutory exceptions to treble damages: whether the Wiersums reasonably believed that they had permission from the property owner to cut the trees.[3] Wietfeld

---

[1]      AS 09.45.730 provides that a person who commits trespass by removing trees or shrubs from another person's property "is liable to the owner of that land . . . for treble the amount of damages that may be assessed in a civil action," unless one of the three exceptions set forth in the statute applies.

[2]      AS 09.17.080 provides the process for determining percentages of fault and apportioning damages in actions where more than one person is liable.

[3]      Under the treble damages statute, a property owner may recover only actual damages for timber trespass if the trespasser had "an honest and reasonable belief" that he had permission from the property owner to cut the trees. *Matanuska Elec. Ass'n v. Weissler*, 723 P.2d 600, 608 (Alaska 1986) (quoting *Curlee v. Donaldson*, 233 S.W.2d 746, 754-55 (Mo. App. 1950)).

filed a cross-motion for summary judgment, arguing that there was no evidence to support a claim of liability against her.

The superior court denied Harder's motion, ruling that whether the Wiersums' actions were reasonable was a question of fact for the jury to decide. The superior court granted Wietfeld's motion, ruling that the material facts regarding Wietfeld's involvement were undisputed and did not support a claim against her. Accordingly, the superior court dismissed the claim against Wietfeld.

Harder and the Wiersums proceeded to trial in May 2010. Harder testified about his reasons for wanting to restore the land to its original condition. As a boy, he had hiked across the property with his friends while hunting and fishing. He lived in the house that he had built on Lot 1B for several years. Even after he moved out of Alaska, he continued to fish in Kodiak in the summers and periodically spent time at the Monashka property with his family. He testified that he held on to the Monashka property for 34 years and that he intended to build a house and live on Lot 1A once his son graduated from college.

Harder testified that he had "always wanted to keep [Lot] 1A" because it was "a very beautiful piece of property." The property was also very private, because the tall trees screened the neighboring houses from view. But after the trees were cut down, the property "looked totally different": It was "full of salmonberry bushes, . . . whereas it was just like thick moss before," he had not heard any ravens there since the trees were cut, and he had lost his privacy. Harder concluded: "It's been . . . altered forever, and all I'm asking is that it's repaired. . . . I mean, I don't want money. I want my trees back."

Harder presented expert testimony on the cost of restoring the land. A forester had identified approximately 70 stumps on Harder's property. An arborist testified that it would cost $161,000 to transplant 70 Sitka spruce trees that were nine to

ten feet tall and an additional $162,000 to replace the forest ground cover. The arborist testified that it was necessary to purchase the trees from a nursery in British Columbia because it was only possible to get trees up to seven feet tall in Alaska. A horticulturist testified to a different method of transplanting larger trees and estimated it would cost $620,537 to restore Harder's property. He agreed that it would be "much easier" and cheaper to transplant smaller trees. Harder conceded on cross-examination that his property was valued at about $27,500 for tax purposes and that it had not suffered any diminution in market value as a result of the lost trees.

At the conclusion of Harder's evidence, the Wiersums filed a motion for a directed verdict on the issue of restoration costs, arguing that Harder had failed to provide evidence of diminution in the value of his property or any damages due to the loss of the wood from the cut trees. They contended that the restoration appraisal figures offered by Harder's experts were not "reasonably proportionate to a zero diminution in market value" as required by this court's decision in *Osborne v. Hurst*.[4] The superior court denied the motion, finding that Harder had presented sufficient evidence to allow the jury to consider the claim.

The Wiersums testified and explained that when they obtained Wietfeld's permission to cut the trees on her property, they believed that she owned the land where the trees were, although they admitted that they did not check public records to verify ownership. The Wiersums then presented evidence from an expert in real estate sales and transactions who testified that in 2005 Harder's property had a listing value of $30,000 - $40,000, and by 2009 would have been listed at $50,000 - $55,000. The expert also testified that the value of the lot would only be "minimally affected, if at all" by the removal of the trees.

---

[4]    947 P.2d 1356, 1358-59 (Alaska 1997).

The Wiersums also presented expert testimony from another arborist who estimated restoration would cost about $34,000. The Wiersums' arborist's restoration estimate for Harder's land was based on the value of the trees removed, the cost of transplanting smaller Sitka spruce from other areas of Kodiak, and the addition of funds to compensate for "the value of what can't be replaced," such as 80 to 100 foot tall trees that were "growing in a forested environment where the root zones [were] intertwined, and . . . where you can't just go and replace that exact tree in that environment." The trees that were removed were valued using the "trunk formula method." This method determines the value of a lost tree by first identifying the price of a replacement tree that is "the largest common available size," and then measuring a cross-section of the lost tree and extrapolating its price based on the price of the replacement tree. The arborist testified that this method is used when it is not possible to replace exact trees due to their size or their growth in a forested environment where their root zones are intertwined. He testified that some of the stumps he identified on Harder's land were from "hazardous trees" that would normally receive a negative value because they would have to be removed by the owner before any house could be built on the property. But, in his appraisal, the arborist classified these trees as "habitat in a forest" and gave them a neutral value. The arborist testified that his restoration plan specifically took into account Harder's interest in restoring the privacy that his property had previously enjoyed.

At the conclusion of their evidence, the Wiersums renewed their motion for a directed verdict, arguing that there was no evidence of diminution in the value of Harder's property and that the only restoration cost figures offered into evidence were disproportionate in light of this "zero" diminution in value. They asserted that there was therefore no evidence in the record from which the jury could conclude that an award of

restoration costs would be objectively reasonable. The superior court again denied the Wiersums' motion.

The jury found that Harder had a "reason personal"[5] that justified restoring the property to its previous condition, and it awarded him $161,000 in compensatory restoration damages. The jury also found that Harder was entitled to statutory treble damages. The Wiersums then filed a motion for a judgment notwithstanding the verdict (JNOV), arguing that "the restoration cost damages awarded to the Plaintiff Paul Harder are manifestly unreasonable as a matter of law in light of the zero diminution in the value of Mr. Harder's property that resulted from the trees being cut." The superior court denied the motion and entered a final judgment in favor of Harder. The Wiersums now appeal, arguing that the superior court erred by dismissing their claims against Wietfeld and by denying their directed verdict and JNOV motions.

## III. STANDARD OF REVIEW

We review the superior court's grant of summary judgment to Wietfeld de novo.[6] Summary judgment is appropriate if, viewing the evidence in the light most

---

[5] Although "the reasonable cost of replacing the land in its original position" is ordinarily an acceptable measure of damages for trespassory harm to land such as the removal or destruction of trees, *see* RESTATEMENT (SECOND) OF TORTS § 929(1)(a) cmt. b (1977), we have allowed for the possibility of disproportionately large restoration costs only if there is a "reason personal to the owner for restoring the land to its original condition." *Osborne*, 947 P.2d at 1359 (internal quotation marks omitted) (citing RESTATEMENT (SECOND) OF TORTS § 929(1)(a) cmt. b).

[6] *Powell v. Tanner*, 59 P.3d 246, 248 (Alaska 2002) (citing *State v. Alaska Civil Liberties Union*, 978 P.2d 597, 603 (Alaska 1999)).

favorable to the non-moving party, there is no genuine dispute over the material facts and the moving party is entitled to judgment as a matter of law.[7]

We also review de novo the superior court's denial of the Wiersums' directed verdict and JNOV motions.[8] The "substantive legal question" is whether, after reviewing the full record presented to the jury in the light most favorable to the non-moving party, a reasonable juror could possibly find in that party's favor.[9] In reviewing the record, this court does not weigh conflicting evidence or judge witness credibility.[10]

## IV. DISCUSSION

### A. The Superior Court Did Not Err By Granting Wietfeld's Motion For Summary Judgment And Dismissing The Claim Against Her.

The Wiersums brought a third-party complaint seeking to apportion fault to Wietfeld on the theory that she was negligent in misrepresenting her ownership of Harder's property when she gave the Wiersums permission to cut down trees. The superior court granted summary judgment in favor of Wietfeld, finding that she did not

---

[7] Alaska R. Civ. P. 56(c); *Powell*, 59 P.3d at 248.

[8] *Cameron v. Chang-Craft*, 251 P.3d 1008, 1017-18 (Alaska 2011) (citing *L.D.G., Inc. v. Brown*, 24 P.3d 1110, 1117 (Alaska 2009)).

[9] *Id.* at 1017. A mid-trial motion for a directed verdict "is essentially a summary judgment motion made after the close of an opponent's case." *Id.* Because the Wiersums renewed their mid-trial motion at the close of all the evidence, we review their motion on the full record presented to the jury.

[10] *Id.* at 1017-18 (citing *City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216, 220 (Alaska 1978), *disapproved on other grounds*, *Native Alaskan Reclamation & Pest Control, Inc. v. United Bank of Alaska*, 685 P.2d 1211, 1220 (Alaska 1984)).

owe a duty to the Wiersums.[11]  But we have previously explained that "fault can only be apportioned under AS 09.17.080 to parties who may be liable to the plaintiff for money damages, including third-party defendants and settling parties."[12]  Thus, the Wiersums' liability cannot decrease through apportionment to Wietfeld unless Wietfeld may be liable to Harder for negligence.  While the superior court twice ruled that Wietfeld did not owe a duty to the Wiersums, it never addressed whether she owed a duty to Harder.  But we are "not bound by the reasoning articulated by the superior court and can affirm a grant of summary judgment on alternative grounds, including grounds not advanced by the superior court or the parties."[13]  We may therefore address the issue of whether Wietfeld owed a duty to Harder when she told the Wiersums that they could cut trees on her property.

### 1. Wietfeld owed no duty to Harder.

In their complaint, the Wiersums contended that fault must be apportioned to Wietfeld because she was negligent when she failed to disclose to the Wiersums that she did not know exactly where her property lines were and that Harder also owned property in the area.[14]  In essence, their negligence claim was based on the theory that

---

[11]    Liability under a negligence theory requires a showing of duty and a breach of that duty.  *See Lyons v. Midnight Sun Transp. Servs., Inc.*, 928 P.2d 1202, 1204 (Alaska 1996) (citing *Alvey v. Pioneer Oilfield Servs., Inc.*, 648 P.2d 599, 600 (Alaska 1982)).

[12]    *Alaska Gen. Alarm, Inc. v. Grinnell*, 1 P.3d 98, 102 (Alaska 2000) (citing *Benner v. Wichman*, 874 P.2d 949, 955-58 (Alaska 1994)).

[13]    *Hoffman Constr. Co. of Alaska v. U.S. Fabrication & Erection, Inc.*, 32 P.3d 346, 351 (Alaska 2001) (citing *Wright v. State*, 824 P.2d 718, 720 (Alaska 1992)).

[14]    Wietfeld argues that the Wiersums either abandoned their apportionment claim in oral argument before the superior court or invited the superior court's alleged (continued...)

Wietfeld had negligently misrepresented or failed to disclose information to the Wiersums, and her negligence caused the Wiersums to trespass on Harder's property and remove Harder's trees, thereby causing Harder to suffer damages.

Negligent misrepresentation requires a showing that a party made a misrepresentation "in the course of [her] business, profession, or employment, or in any other transaction in which [she] has a pecuniary interest."[15] Similarly, liability for failure to disclose information when there is an affirmative duty to do so occurs when one party "fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction."[16] There is no evidence to support, and the parties do not argue, that Wietfeld was involved in a business transaction with the Wiersums or had a pecuniary interest in the removal of the trees. Thus, Wietfeld owed no duty under a theory of negligent misrepresentation or failure to disclose information when she had an affirmative duty to do so.[17]

---

[14](...continued)
error in dismissing the claim. But we need not reach this issue because we conclude that there is no evidence to support the Wiersums' arguments that Wietfeld owed a duty to Harder under a theory of negligent misrepresentation, nondisclosure, or general negligence.

[15]     RESTATEMENT (SECOND) OF TORTS § 552(1) (1977); *see also Valdez Fisheries Dev. Ass'n v. Alyeska Pipeline Serv. Co.*, 45 P.3d 657, 671 (Alaska 2002); *Bubbel v. Wien Air Alaska, Inc.*, 682 P.2d 374, 380 (Alaska 1984).

[16]     RESTATEMENT (SECOND) OF TORTS § 551(1) (1977); *see also Arctic Tug & Barge, Inc. v. Raleigh, Schwarz & Powell*, 956 P.2d 1199, 1202 (Alaska 1998); *Turnbull v. LaRose*, 702 P.2d 1331, 1334 (Alaska 1985).

[17]     Even if Wietfeld had owed a duty under one of these theories, she would have owed this duty to the Wiersums and not to Harder. Thus, a breach of this duty would not be sufficient to apportion fault to Wietfeld for the harm caused by the Wiersums' trespass.

We turn next to the question whether Wietfeld owed a duty to Harder under a general negligence theory. The Wiersums argue that Wietfeld owed a broad duty of care to her neighbors — both themselves and Harder — and is liable for any unreasonable risk of harm to these parties that stems from her own conduct. They support this assertion with references to the Restatement (Second) of Torts § 158[18] and § 165,[19] as well as a treatise on tort law. They also cite to case law from other states for the rule that "[a] landowner who intends to have timber cut on his land owes a duty to an adjoining landowner to ascertain the boundary line of the adjoining land with diligence and care."[20] But these sources do not support the imposition of a duty in this case.

Sections 158 and 165 of the Restatement (Second) of Torts are inapplicable here. Comment j to section 158 indicates that the section is intended to apply to cases

---

[18]     This section provides, in relevant part:

> One is subject to liability to another for trespass . . . if he intentionally
>
> (a) enters land in the possession of the other, or causes a thing or a third person to do so, . . . .

[19]     This section provides:

> One who recklessly or negligently, or as a result of an abnormally dangerous activity, enters land in the possession of another or causes a thing or third person so to enter is subject to liability to the possessor if, but only if, his presence or the presence of the thing or the third person upon the land causes harm to the land, to the possessor, or to a thing or a third person in whose security the possessor has a legally protected interest.

[20]     *Burris v. Krooss*, 563 S.W.2d 875, 877 (Tex. Civ. App. 1978) (citing *Kirby Lumber Corp. v. Karpel*, 233 F.2d 373 (5th Cir. 1956)).

where "by any act of his, the actor *intentionally* causes a third person to enter land."[21] To satisfy the element of intent, the actor must "command[] or request[]" a third person to enter the land of another.[22] Section 158 thus applies the general principle that "one who intentionally causes another to do an act is under the same liability as though he himself does the act in question."[23] There is no evidence in the record that Wietfeld commanded or requested that the Wiersums enter Harder's land and remove his trees. Section 158 is therefore inapplicable.

Section 165 similarly provides no support for the Wiersums' position. Section 165 imposes liability where a party recklessly or negligently enters land in possession of another, or causes "a thing or third person so to enter," and thereby harms the land.[24] Comment a to this section indicates that the rule applies where "the conduct of the actor either . . . involve[s] an unreasonable risk of invading the possessor's interest in his exclusive possession of the land, or . . . [is] caused by an abnormally dangerous activity carried on by the actor."[25] As examples, the illustrations to section 165 indicate that liability may apply to reckless or negligent driving of an automobile that results in a crash on another's land; a "balloon ascension" at a county fair that the owners should realize is likely to touch down on the land of another, and does; a landowner's blasting to excavate a cellar that causes damage to a neighbor's house; and a jet pilot who crashes

---

[21] RESTATEMENT (SECOND) OF TORTS § 158 cmt. j (1965) (emphasis added).

[22] *Id.*

[23] *Id.*

[24] RESTATEMENT (SECOND) OF TORTS § 165 (1965).

[25] *Id.* at cmt. a.

an experimental plane onto another party's land.[26] Unlike these illustrations, Wietfeld's act of giving the Wiersums permission to cut trees on her own land did not present an unreasonable risk that the Wiersums would enter Harder's land and cut his trees. Section 165 is therefore also inapplicable here.

The Wiersums next cite case law from Texas for the rule that landowners who intend to cut timber on their own land owe a duty to adjoining landowners to ascertain the boundary lines of the adjoining land.[27] This rule was established in *Kirby Lumber Corp. v. Karpel*,[28] a seminal case in which the United States Court of Appeals for the Fifth Circuit applied Texas law. In *Kirby Lumber*, landowners in Texas brought a suit for damages against their neighbors, a lumber corporation, and individuals who unwittingly advised a timber removal company to harvest trees from the landowners' property.[29] The defendant-landowners had arranged with a timber removal company to cut and sell timber from their land to a lumber corporation.[30] An agent for the defendant-landowners took a representative of the timber removal company to the property and pointed out "one or two" of the property lines.[31] The agent then referred the representative to an associate who subsequently gave the representative incorrect boundary lines resulting in the removal of timber from a neighboring piece of property

---

[26] *Id.* at cmt. c & cmt. e.

[27] *See Burris v. Krooss*, 563 S.W.2d 875, 877 (Tex. Civ. App. 1978) (citing *Kirby Lumber Corp. v. Karpel*, 233 F.2d 373 (5th Cir. 1956)).

[28] 233 F.2d at 375.

[29] *Id.* at 374-75.

[30] *Id.* at 374.

[31] *Id.*

owned by the plaintiffs.[32]  The Fifth Circuit concluded that the defendant-landowners, acting through their agents, had failed to discharge their duty to show the correct location of the boundary lines and were therefore liable for trespass because they "aid[ed], assist[ed], or advise[d]" the timber removal company.[33]

Unlike the defendant-landowners in *Kirby Lumber*, Wietfeld did not seek out the Wiersums to remove trees from her land, nor did she affirmatively offer inaccurate information about her property boundaries.  The Wiersums did not ask her for this information and, because this was not a business transaction, she was under no legal obligation to provide it.[34]  Under the reasoning of *Kirby Lumber*, and the line of cases that rely upon it, Wietfeld did not assume a duty to give accurate information to the Wiersums when they asked permission to remove her trees.

Finally, the Wiersums' reliance on Prosser and Keeton's treatise on tort law for the rule that a landowner owes a broad duty "to cause no unreasonable risks of harm to others in the vicinity" is also unavailing.[35]  Our prior decisions recognize that landowners have a "duty to use due care to guard against unreasonable risks created by dangerous conditions existing on their property."[36]  We have also held that a landowner must act "as a reasonable person in maintaining his property in a reasonably safe

---

[32]     *Id.*

[33]     *Id.* at 375.

[34]     *See* RESTATEMENT (SECOND) OF TORTS § 551(1) (1977); *see also Arctic Tug & Barge, Inc. v. Raleigh, Schwarz & Powell*, 956 P.2d 1199, 1202 (Alaska 1998); *Turnbull v. LaRose*, 702 P.2d 1331, 1334 (Alaska 1985).

[35]     W. PAGE KEETON, DAN B. DOBBS, ROBERT E. KEETON & DAVID G. OWEN, PROSSER & KEETON, THE LAW OF TORTS § 57, at 386 (5th ed. 1984).

[36]     *Estate of Mickelsen ex rel. Mickelsen v. North-Wend Foods, Inc.*, 274 P.3d 1193, 1199 (Alaska 2012) (quoting *Burnett v. Covell*, 191 P.3d 985, 989 (Alaska 2008)).

condition in view of all the circumstances."[37] But we have never previously gone so far as to hold that a landowner has a broad duty to prevent the unreasonable risk of harm to her neighbors caused by third parties.

In the absence of statute, regulation, contract, or case law, the question of whether an actionable duty of care exists "is essentially a public policy question."[38] In *D.S.W. v. Fairbanks North Star Borough School District*, we identified a number of factors to guide this inquiry.[39] As we recently observed in *Hurn v. Greenway*, foreseeability of harm is the most important factor, followed by the burden on the defendant and the consequences to the community.[40] Thus, "there can be no duty where the harm is unforeseeable, but foreseeability alone is insufficient to establish a duty if the burden of taking care or the effect on society is too harsh."[41]

The foreseeability of harm to Harder resulting from Wietfeld's conduct was low. Wietfeld made no active representation to the Wiersums to imply that the trees on

---

[37] *Webb v. City & Borough of Sitka*, 561 P.2d 731, 733 (Alaska 1977), *superseded on other grounds by statute*, AS 09.65.200, *as recognized in Univ. of Alaska v. Shanti*, 835 P.2d 1225, 1228 n.5 (Alaska 1992) (discussing AS 09.45.795, subsequently renumbered as AS 09.65.200).

[38] *D.S.W. v. Fairbanks N. Star Borough Sch. Dist.*, 628 P.2d 554, 555 (Alaska 1981).

[39] These factors are: The foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved. *Id.*

[40] 293 P.3d 480, 486-87 (Alaska 2013).

[41] *Id.* at 487 (internal citations omitted).

the hillside near the Wiersums' property were hers and not Harder's. She merely gave the Wiersums permission to cut trees on her own land. It was thus foreseeable that the Wiersums would cut trees on Wietfeld's property. But it was not foreseeable that the Wiersums would remove 70 large trees from the hillside of Harder's property — some of which were located between 300 and 400 feet from the Wiersums' own land — without conducting proper due diligence to identify the true property owner and then seeking that person's permission. "No person can be expected to guard against harm from events which are not reasonably to be anticipated at all, or are so unlikely to occur that the risk, although recognizable, would commonly be disregarded."[42]

The burden on Wietfeld and the negative consequences to the community of imposing a duty under these circumstances are also significant. Imposing such a duty would inflict large judgments on parties like Wietfeld, who would be forced to pay for the unforeseeable reckless or negligent conduct of a third party if it results in harm to a neighbor's property. The community would also be burdened because landowners would be required to acquire and provide accurate information about their property boundaries before granting their neighbors permission to take any action on their land, lest they be exposed to tort liability. We think a sounder policy is to require any party who seeks to benefit by removing trees from another's property to identify the true property owner and confirm accurate property boundaries.

On balance, we conclude that Wietfeld owed no duty to inform the Wiersums of Harder's property lines when they asked to cut trees on her property, and we affirm the superior court's grant of summary judgment to Wietfeld.

---

[42]     PROSSER & KEETON, THE LAW OF TORTS § 31, at 170.

**2.** **We decline to reverse the superior court's grant of summary judgment to Wietfeld based on new arguments raised for the first time on appeal.**

The Wiersums also argue for the first time on appeal that there is a genuine issue of fact regarding whether Wietfeld is liable for trespass. But at trial, counsel for the Wiersums expressly stated that the Wiersums were "not trying to hold [Wietfeld] liable specifically for the elements of trespass." We have previously stated that we will affirm a grant of summary judgment on alternative grounds, including grounds that were not advanced by the parties, and may consider "any matter appearing in the record, even if not passed upon by the superior court, in defense of the judgment."[43] But the Wiersums ask us to reverse a grant of summary judgment on grounds that were specifically disclaimed at trial and therefore not considered by the superior court. In the interests of fairness to the trial court and justice to Wietfeld, we decline to reverse the superior court's ruling based on new arguments raised for the first time on appeal.[44]

**B.** **The Superior Court Did Not Err By Denying The Wiersums' Motions For Directed Verdicts.**

The Wiersums challenge the superior court's denial of their two motions for directed verdicts on Harder's claim for restoration damages. They argue that Harder

---

[43] *Hoffman Constr. Co. of Alaska v. U.S. Fabrication & Erection, Inc.*, 32 P.3d 346, 351 (Alaska 2001); *see also Sengupta v. Univ. of Alaska*, 21 P.3d 1240, 1255 (Alaska 2001); *Pierce v. Pierce*, 949 P.2d 498, 500-01 (Alaska 1997); *Williams v. Alyeska Pipeline Serv. Co.*, 650 P.2d 343, 351 (Alaska 1982).

[44] *See Harvey v. Cook*, 172 P.3d 794, 802 (Alaska 2007) ("Ordinarily, a party seeking to raise an issue on appeal must have raised it and offered evidence on it in the trial court. Therefore, issues not properly raised in the trial court will not ordinarily be considered on appeal. This rule is based on the belief that permitting a party to claim error regarding a claim not raised and litigated below 'is both unfair to the trial court and unjust to the opposing litigant.' " (quoting *In re Marriage of Walker*, 42 Cal. Rptr. 3d 325, 332 (Cal. App. 2006))).

presented insufficient evidence of a reason personal to justify restoration damages. Harder contends that the Wiersums have failed to preserve this argument because they did not challenge the existence of his reason personal in either of their motions for directed verdict. In the alternative, Harder argues that he presented sufficient evidence of a reason personal for the issue to reach the jury.

As a general matter, a party waives an argument if the party did not raise it in the superior court.[45] Harder is correct that the Wiersums did not explicitly challenge the existence of his reason personal when they moved for directed verdict. The Wiersums' arguments in favor of directed verdict centered on an alleged lack of evidence of diminution in the value of Harder's property, and thus lack of a basis for an award of damages. The Wiersums have therefore waived the argument that Harder presented insufficient evidence of a reason personal and after reviewing the merits of the Wiersums' argument, we conclude that there was no reversible error by the superior court.[46]

We have recognized that a party who is injured by an invasion of his property "not totally destroying its value" may choose as damages "either the loss in value or reasonable restoration costs."[47] To determine whether an award of restoration

---

[45]    *See Kingery v. Barrett*, 249 P.3d 275, 281 n.15 (Alaska 2011) (citing *Blood v. Kenneth A. Murray Ins., Inc.*, 151 P.3d 428, 431 n.17 (Alaska 2006)).

[46]    *Miller v. Sears*, 636 P.2d 1183, 1189 (Alaska 1981) ("We decline to review claims not raised below except to the extent that they may constitute plain error.").

[47]    *Osborne v. Hurst*, 947 P.2d 1356, 1358 (Alaska 1997) (quoting *G & A Contractors, Inc. v. Alaska Greenhouses, Inc.*, 517 P.2d 1379, 1385 (Alaska 1974)) (internal quotation marks omitted).

costs is appropriate, we have adopted the test set forth in Restatement (Second) of Torts § 929,[48] which provides in part:

> (1) If one is entitled to a judgment for harm to land resulting from a past invasion and not amounting to a total destruction of value, the damages include compensation for
>
> (a) the difference between the value of the land before the harm and the value after the harm, or at his election in an appropriate case, the cost of restoration that has been or may be reasonably incurred.[49]

Comment b to § 929 explains that damages are measured only by the difference between the value of the land before and after the harm if the "cost of replacing the land in its original condition is disproportionate to the diminution in the value of the land caused by the trespass, unless there is a *reason personal* to the owner for restoring the original condition."[50] We have previously interpreted "reason personal" to mean peculiar or special to the owner.[51] We require the landowner to demonstrate a reason personal because we believe it indicates circumstances "where the owner holds property primarily for use rather than for sale and where the owner is likely to make repairs with the restoration costs award rather than to pocket the funds and enjoy a windfall."[52]

In *G & A Contractors, Inc. v. Alaska Greenhouses*, we concluded that restoration damages were proper because the plaintiff's use of the damaged property as "a showplace in connection with his nursery business" was a purpose "peculiar" to the

---

[48] *See id.*; *see also Andersen v. Edwards*, 625 P.2d 282, 288 (Alaska 1981).

[49] RESTATEMENT (SECOND) OF TORTS § 929 (1977).

[50] *Id.* at cmt. b (emphasis added).

[51] *See Osborne*, 947 P.2d at 1359 (citing *Andersen*, 625 P.2d at 288).

[52] *Id.*

plaintiff.[53] In *Osborne v. Hurst*, we suggested that a reason personal may also exist where a plaintiff owns a piece of property "because of its unique views, its abundant trees, and the unusual juxtaposition of the trees, the cabin, and the views."[54] We also found relevant the plaintiff's testimony that "other properties in the area were not comparable," and that she and her partner planned to use the property for their retirement.[55]

In *Andersen v. Edwards*, however, we determined that the plaintiff had not demonstrated a reason personal because he had not shown that trees cut on his property were particularly valuable to him "because of their beauty, location, quality, size or other particular features."[56] The trees were not "ornamental" and did not have any "special value" beyond the fact that they were located on the plaintiff's property.[57] We concluded that the plaintiff had not demonstrated a reasonable likelihood that the trees would be restored, and we held that the appropriate measure of damages was the diminution in value of the property or the economic value of the timber that was cut.[58]

Harder presented evidence at trial that he held on to the Monashka property for 34 years and that he intended to build a house and live on Lot 1A once his son graduated from college because "it's a very beautiful piece of property." Harder's sister confirmed that Harder intended to build a cabin on the property. A real estate agent also

---

[53] 517 P.2d 1379, 1387 (Alaska 1974).

[54] 947 P.2d at 1360.

[55] *Id.*

[56] 625 P.2d at 288-89.

[57] *Id.* at 289.

[58] *Id.*

testified that he approached Harder about selling the land, but Harder refused to sell. And Harder testified that he "[didn't] want money," he only "want[ed his] trees back" and was therefore asking for damages to restore the property by replanting the forested area. He testified that Lot 1A had a "big, nice, beautiful" carpet of moss and that the property was very private, because the tall trees screened the neighboring houses from view. He also testified that he enjoyed spending time with his children on the property, but that after the trees were cut down, the property "looked totally different": It was now "full of salmonberry bushes, . . . whereas it was just like thick moss before," and he reported that he had not heard any ravens there since the trees were cut. In light of this testimony, we cannot conclude that the superior court erred in determining that Harder had presented sufficient evidence of a reason personal for the issue of restoration costs to be submitted to the jury.

C. **The Superior Court Erred By Denying The Wiersums' JNOV Motion.**

The Wiersums also challenge the superior court's denial of their JNOV motion. They argue that the superior court erred because the jury's award of restoration damages is objectively unreasonable given its disproportionate relationship to the property's diminution in value and because Harder's "minimal use of and contribution to the land's special value would at most justify a marginal award of restoration costs." Harder argues that the jury's award was supported by sufficient evidence and was "the minimal amount reasonable to restore the trees."

We have twice considered the reasonableness of restoration costs that exceed the diminution in the market value of the plaintiff's property. In *G & A Contractors*, we rejected a defendant's argument that restoration damages were "grossly disproportionate" where the property owner had paid $4,000 per acre for the property and the jury awarded $12,550 for restoring 10,560 square feet (about a quarter-acre) of

land.[59] Because the owner "indicated that the principle value of the property was from the creek running through it," and claimed that he intended to use the property "to create a showplace in connection with his nursery business," we held that "it was not error to award the reasonable cost of restoring the property to its original condition."[60]

Subsequently, in *Osborne*, we cautioned that "restoration costs exceeding diminished market value may be awarded only to the extent such added costs are objectively reasonable in light of the 'reason personal' and in light of the diminution in value."[61] The plaintiff in *Osborne* had advanced a non-commercial reason personal based on the property's "unique views, its abundant trees, and the unusual juxtaposition of the trees, the cabin, and the views."[62] We recognized that the record "unquestionably showed that restoration costs were disproportionately higher than diminished market value" where the property owners sought restoration costs of $170,000 for property that had only diminished in value from $32,000 to $21,000.[63] We emphasized that a restoration award must be limited to "the cost of restoration that has been or may be *reasonably* incurred," and that the purpose for this rule is "to reduce the economic waste that occurs when a party incurs repair costs in excess of the diminished value of the property."[64]

---

[59]  *G & A Contractors, Inc. v. Alaska Greenhouses, Inc.*, 517 P.2d 1379, 1387 (Alaska 1974).

[60]  *Id.*

[61]  *Osborne v. Hurst*, 947 P.2d 1356, 1360 (Alaska 1997).

[62]  *Id.*

[63]  *Id.* at 1357, 1360.

[64]  *Id.* at 1360 (emphasis in original). We also explained in a footnote that
(continued...)

Taken together, *G & A Contractors* and *Osborne* instruct that restoration costs exceeding diminished market value may be awarded only to the extent that restoration costs are objectively reasonable in light of the property owner's reason personal and the diminution in value of the property. The application of this general principle must ensure that an award of restoration damages does not confer a windfall upon a landowner.

The California Court of Appeal addressed this issue in a factually similar case. In *Heninger v. Dunn*,[65] a property owner lived on wooded property in the mountains and his neighbors bulldozed a road across his land, damaging trees and vegetation.[66] The road actually increased the property's value from $179,000 to $184,000.[67] Because there was no depreciation in property value, the superior court ruled that the property owners were not entitled to any damages.[68] The appeals court reversed, relying on the general rule that restoration costs that exceed the property's decrease in fair market value may be justified if the owner has a reason personal for restoring the property to its original condition.[69] But the *Heninger* court stressed that property owners may only recover *reasonable* costs of replacing destroyed trees,

---

[64](...continued)
while a jury might conclude that the plaintiffs had a valid reason personal justifying *some* restoration costs in excess of the property's diminished market value, the jury could also conclude that "expenditure of the full estimated cost of $170,000 would not be reasonable." *Id.* at 1360 n.1.

[65]     162 Cal. Rptr. 104 (Cal. App. 1980).

[66]     *Id.* at 106.

[67]     *Id.*

[68]     *Id.*

[69]     *Id.* at 107.

explaining that restoration of property to its original condition may not always be reasonable:

> Proposed replacement costs may be unreasonable or excessive in relation to the damage inflicted upon the land or its value prior to the trespass. In such cases, the achievement of a reasonable approximation of the land's former condition may involve something less than substantially identical restoration. . . . [I]t may be more appropriate to award costs for the planting of saplings, or a few mature trees, or underbrush to prevent erosion and achieve a lesser but, over time, reasonable aesthetic restoration.[70]

The California court concluded that "substantially identical restoration," which was estimated to cost approximately $240,000 and involved transplanting a large number of mature trees, was "a manifestly unreasonable expense in relation to the value of the land prior to the trespass."[71] The court instructed that, on remand, the trial court's determination of reasonable restoration costs should focus on whether restoring the property with sapling trees and ground cover would achieve reasonable aesthetic restoration.[72]

Applying these principles to Harder's property, the award of $161,000 in restoration costs is objectively unreasonable in light of the pre-trespass total value of Harder's property, Harder's reason personal for restoration, and the absence of any documented decrease in the value of Harder's property. Under these circumstances, it

---

[70]    *Id.* at 108-09 (citations omitted).

[71]    *Id.* at 109. *Cf. Kelly v. CB&I Constructors, Inc.*, 102 Cal. Rptr. 3d 32, 41 (Cal. App. 2009) (restoration costs in excess of the property's value before the trespass were supported by substantial evidence that the costs were necessary to make the property safe and habitable by plaintiff and his family and suitable for use as a horse ranch).

[72]    *Heninger*, 162 Cal. Rptr. at 109.

is "more appropriate to award costs for the planting of saplings, or a few mature trees, or underbrush to prevent erosion and achieve a lesser but, over time, reasonable aesthetic restoration."[73] The record shows that Harder's property could be reasonably restored by replacing at least some of the mature Sitka spruce with saplings or smaller trees and that because the property's large trees were "growing in a forested environment where the root zones [were] intertwined" it was not possible to "replace that exact tree in that environment."

In light of the record in this case and decisions in *G & A Contractors* and *Osborne*, we conclude that the superior court erred in denying the Wiersums' motion for a JNOV. The jury was required to base its restoration award on a finding that the restoration costs were objectively reasonable in light of the value of Harder's land, the diminution of its value, and his reason personal. In this case, viewing the evidence in the light most favorable to the nonmoving party, as we must when we review a superior court's decision to grant or deny a JNOV,[74] we conclude that no reasonable juror would award restoration costs totaling more than four times the full fair market value of Harder's property before the trespass. Because we conclude that the jury's award of $161,000 in compensatory restoration damages was objectively unreasonable, and that the Wiersums were entitled to judgment notwithstanding the verdict, we vacate the damage award and remand for a new trial on damages.

Because a new trial on damages is required, we address the question whether inadmissible evidence was admitted at trial in order to provide guidance to the trial court on remand. The Wiersums argue that the superior court erred by allowing inadmissible evidence and improper arguments. A review of the record shows that the

---

[73]     *Id*.

[74]     *Cameron v. Chang-Craft*, 251 P.3d 1008, 1017-18 (Alaska 2011).

Wiersums failed to object to much of the evidence that they now challenge on appeal. The Wiersums do, however, identify one piece of evidence that the superior court admitted over their objection: The superior court allowed Harder to testify to and submit as evidence a purported notarized "contract" with the jurors, promising them that he would use any award of restoration damages to restore his property. Harder was then permitted to testify that "if the jury is not cool with this document, you can write anything you want for me. I'll do it."

We agree with the Wiersums that Harder's tactic is unprecedented and that allowing this evidence was improper and "fundamentally unfair." As the Wiersums correctly maintain, "a promise of restoration couched in the form of a contract is a particularly misleading form of a promise." This is exemplified by Harder's claim in the purported contract that he would restore the property "at the risk of being prosecuted for fraud." But Harder's one-sided promise with the jury was not legally enforceable. Moreover, by suggesting that the jury could modify the agreement and "write anything [they] want for me," Harder intimated that the jurors had some control over the terms of the purported agreement, which they did not.

Because contracts are widely recognized to be legally enforceable agreements, proposing such a "contract" with the jurors was likely to have misled jurors into believing that Harder's promise to restore his property was legally enforceable when it was not. The jury's decision on the proper amount of damages could thus have been impermissibly influenced by a false belief that Harder was legally bound to use a damage award to restore his property. On remand, this evidence and testimony shall not be admitted.

## V.  CONCLUSION

We AFFIRM the superior court's decision granting summary judgment to Wietfeld and dismissing the claim against her.  We AFFIRM the superior court's decision denying the Wiersums' two motions for directed verdict.  We REVERSE, however, the superior court's ruling denying the Wiersums' JNOV motion and we REMAND for a new trial on damages.

FABE, Chief Justice, concurring.

I agree with the court's opinion in almost all respects. But in my view, the award on remand should be limited by the principle that restoration damages will not ordinarily be objectively reasonable if they exceed the total market value of the property before the trespass. I would therefore order a remittitur, limiting the amount of compensatory damages to the highest total value for the property given at trial: $40,000.[1]

In *Osborne v. Hurst*, we relied on the Restatement (Second) of Torts for the proposition that an injured landowner may recover compensatory damages in an amount that either accounts for the diminution in the value of the land caused by the trespass or allows the land to be restored to its pre-trespass condition.[2] We recognized that the court may award restoration costs that exceed diminution of value where there is a reason personal to the owner for restoring the land to the original condition.[3] But we cautioned that these costs must be objectively reasonable in light of the property owner's reason personal for restoring the land and the amount of the land's diminution in value.[4] The reason for this rule is to "reduce the economic waste that occurs when a party incurs repair costs in excess of the diminished value of the property" and to ensure that the landowner does not enjoy a windfall.[5] In my view, an award of restoration damages that exceeds the total market value of the property before the trespass should not ordinarily

---

[1]     With treble damages under AS 09.45.730, the total award would be $120,000 before the addition of pre- and post-judgment interest and attorney's fees.

[2]     947 P.2d 1356, 1358-59 (Alaska 1997) (citing RESTATEMENT (SECOND) OF TORTS § 929(1)(a) cmt. b (1977)).

[3]     *Id.* at 1359.

[4]     *Id.* at 1360.

[5]     *Id.*

be viewed as objectively reasonable because it would result in economic waste and potentially confer on the property owner the "windfall" we warned against in *Osborne*.[6]

The question in this appeal is whether the $161,000 in restoration costs awarded as compensatory damages was objectively reasonable in light of Harder's reason personal for restoring his property and any diminution in the value of Harder's property as a result of the Wiersums' trespass. I would add to the considered factors the total market value of Harder's property before the trespass and would hold that compensatory damages to restore land based on a reason personal should not ordinarily exceed the total value of the property prior to trespass. And because the compensatory damage award in this case was over four times the total market value of Harder's property before the trespass, the award of restoration damages could not possibly be viewed as objectively reasonable.

Other jurisdictions have limited damages for restoration costs to the total value of the property before the trespass. In *Keitges v. VanDermeulen*, the Nebraska Supreme Court held that a landowner who intended to use his land for recreational or residential purposes could recover restoration costs but that those costs could not exceed the fair market value of the property before the injury.[7] The landowners in *Keitges* had bought a 10-acre parcel of unimproved property with the intention of building a house in the future and had used the land for "recreational purposes such as 'nature hikes' with their children."[8] While constructing a fence, a neighbor cut approximately 100 trees and damaged an area "at least 450 feet long and 8 to 10 feet wide" on the landowners'

---

[6]     *Id.* at 1359.

[7]     483 N.W.2d 137, 143 (Neb. 1992).

[8]     *Id.* at 138-39.

property.[9] The Nebraska Supreme Court held that the proper measure of damages in an action for compensatory damages for destruction of trees and land used for residential or recreational purposes was the cost of reasonable restoration of the landowner's property to its preexisting condition or to a condition as close as reasonably feasible.[10] That court reasoned that "the principle underlying allowance of damages is to place the injured party in the same position, so far as money can do it, as he would have been had there been no injury or breach of duty, that is, to compensate him for the injury actually sustained."[11] But the Nebraska Supreme Court limited the outside boundary of reasonableness to the property's total value before injury: "[T]he award for such damage may not exceed the market value of the property immediately preceding the damage."[12]

Similarly, in *Vaught v. A.O. Hardee & Sons, Inc.*, the South Carolina Supreme Court relied on *Keitges* and our decision in *Osborne* to hold that a landowner may not recover restoration costs for noncommercial trees and shrubs that exceed the total market value of the property prior to the loss.[13] In *Vaught*, landowners who used their property for hunting and recreation brought suit against a construction company that negligently set a fire that spread to the landowners' property and burned approximately 21 acres of land and over 1,000 trees.[14] The South Carolina Supreme Court held that the diminution in value of a parcel of property will generally be the

---

[9]     *Id.* at 139.

[10]     *Id.* at 143.

[11]     *Id.* at 142 (quoting *"L" Invs., Ltd. v. Lynch*, 322 N.W.2d 651, 656 (Neb. 1982)).

[12]     *Id.* (citing *"L" Invs., Ltd.*, 322 N.W.2d at 656).

[13]     623 S.E.2d 373, 377-78 (S.C. 2005).

[14]     *Id.* at 374-75.

proper measure of damages in a case of trespass unless the cost of restoration is less than the amount of diminution, in which case restoration damages may be the proper measure.[15] But where the cost of restoration exceeds the amount of diminution in value, the cost of restoration may be awarded "when the landowner has a personal reason relating to the land for restoring the land to its original condition and when the cost of restoration is reasonable in relation to the damage inflicted."[16] The South Carolina court limited this rule, holding that "the landowner may not recover restoration costs which exceed the market value of the entire parcel prior to the loss."[17]

Applying these principles to this case, the evidence most favorable to Harder indicates that prior to the trespass, Harder's entire property was valued at $40,000. Thus, while I agree with the court's opinion that Harder demonstrated sufficient evidence of a reason personal to award objectively reasonable restoration costs, an award that exceeds the property's total market value of $40,000 is not reasonable under the circumstances of this case. And the jury's award, which exceeded the value of the entire property by $121,000, is certainly not reasonable.

To avoid the unnecessary expense to the parties of a new trial on damages, I would simply order a remittitur,[18] allowing Harder to choose whether to accept a

---

[15]     *Id.* at 377-78.

[16]     *Id.* at 378.

[17]     *Id.*

[18]     *See Norcon, Inc. v. Kotowski*, 971 P.2d 158, 175 (Alaska 1999) ("Where we find an award to be excessive we will vacate the award and may order a remittitur." (citing *Sturm, Ruger & Co. v. Day*, 615 P.2d 621, 624 (Alaska 1980))); *see also Lynden Inc. v. Walker*, 30 P.3d 609, 620 (Alaska 2001) (vacating an award of future medical expenses and ordering a remittitur where the jury did not have adequate information before it on which it could have based an award).

remittitur of $40,000, the total value of his property prior to the trespass, or to have a new trial on the issue of damages.[19] Harder might prefer a new trial in order to present additional expert testimony on the market value of his property before the trespass because that was not the focus of trial. But I would give Harder the choice between accepting a compensatory award of $40,000, which would be trebled under AS 09.45.730, or requesting a new trial on damages.

---

[19]     *See Lynden*, 30 P.3d at 620 n.63.

CARPENETI, Justice, with whom WINFREE, Justice, joins, concurring in part and dissenting in part.

I agree with all of the conclusions reached in today's opinion but one. The opinion decides, without explicitly so holding, that the superior court's error in denying the Wiersums' JNOV motion extended only to the amount of restoration damages awarded. But I believe that this error did more: It fatally infected the jury's finding that Harder had a "reason personal" that would justify the use of restoration damages at all, rather than diminution damages, in a case such as this where restoration damages are disproportionate to diminution in value. For this reason, I would reverse the judgment and remand for retrial on all damages issues, including whether restoration damages are appropriate.

Today's opinion concludes that the superior court erred in allowing Harder to introduce a purported contract with the jurors. The contract promised that Harder would spend all restoration damages to restore his property. The opinion also finds error in the superior court allowing Harder to offer the jury the option to revise the contract in any way that it saw fit and in promising that he would comply with the document as revised. I agree with the court's conclusion that admission of this evidence was error.

But I disagree with the unstated conclusion that the only effect of this error was to require a retrial on the amount of restoration damages. The admission of this evidence throws doubt on the jury's conclusion that restoration damages are appropriate at all. I disagree with today's opinion because under our law concerning the use of restoration damages it is clear that the admission of this evidence appreciably affected the jury's verdict and therefore affected the substantial rights of the Wiersums.

*Admission of the evidence was error.*

Harder was successful in obtaining the admission, over the Wiersums' objections, of a purported contract which read as follows:

> I Paul Harder do hereby solemnly swear, at the risk of being prosecuted for fraud, to replant a minimum of 70 Sitka spruce trees and no less than 6500 square feet of understory on Lot 1A block 8 Monashka bay subdivision, if awarded restoration damages from the Harder versus Wiersum[]s law suit. I Paul Harder agree to use all those restoration damages solely for restoration and to plant the largest trees that the award will afford. . . . Paul Harder agrees that restoration damages shall be held in an escrow trust by his attorney Jill Wittenbrader and doled out as needed to complete the job.

The document, characterized by Harder's attorney as "a contract to the jurors," was signed by Harder and notarized. During his testimony, Harder read the "contract" to the jury and then testified about it: "And I would like to add that if the jury is not cool with this document, you can write anything you want for me. I'll do it. I want to plant the trees back and I want you to know that I [will]."

Today's opinion by the court correctly concludes that admission of this evidence was error, for at least two reasons. First, Harder's tactic was "unprecedented" and "allowing this evidence was improper and 'fundamentally unfair' " because the "one-sided promise with the jury was not legally enforceable." Second, by suggesting that the jury could legally modify the contract in any way that it wanted, "Harder intimated that the jurors had some control over the terms of the purported agreement, which they did not."

*Admission of the evidence appreciably affected the verdict.*

But the court's opinion does not go far enough in assessing the harm caused by admission of this evidence. The jury's task, after finding liability, was to determine whether the measure of damages would be diminution in value of the land or the

-35- 6815

reasonable cost of restoration of the land.[1] Restoration damages that are disproportionate to the diminution in value[2] can be awarded only if the owner has a reason personal that would justify the higher award (and if the amount of restoration costs is not unreasonably disproportionate to the diminution in value).[3]

Jury Instruction No. 16, which no party has challenged and which correctly stated the law, provided that in determining "whether there is a 'reason personal' to Mr. Harder for restoring the property, you may consider the nature of the property, how it was used, *the likelihood that he would actually restore it*, or any other factors you think are important." (Emphasis added.) The challenged evidence — both the language of the "contract" with the jury that was admitted into evidence and Harder's testimony embellishing the contract, allegedly enforceable by a prosecution for fraud were he to fail to use an award only for restoration — would have looked to a jury like an ironclad guarantee binding Harder to use any award for restoration. Thus, on the critical issue of whether Harder had a reason personal for obtaining restoration costs, on one of only three factors it was instructed to consider the jury was erroneously provided apparently rock-solid evidence on which to rely in making that determination.

---

[1] *Osborne v. Hurst*, 947 P.2d 1356, 1359 (Alaska 1997).

[2] The evidence at trial regarding restoration damages ranged from about $34,000 to over $600,000. The evidence at trial regarding diminution in value of the land suggested that the market value of the land before the trees were cut and after remained the same. The superior court found that the borough property tax assessment for the lot was the same before and after the trees were cut.

[3] *Osborne*, 947 P.2d at 1359 (citing RESTATEMENT (SECOND) OF TORTS § 929(1)(a) cmt. b (1977)).

In deciding whether the erroneous admission of evidence will support reversal of a verdict, we look to whether the error "substantially affect[ed] the verdict,"[4] "appreciably affect[ed] the jury's verdict,"[5] or "affected the substantial rights of a party."[6] I believe it to be beyond argument that admission of the "contract" and Harder's testimony regarding the "contract" meets this standard in all of its manifestations. A jury faced with determining whether Harder had a reason personal and looking to the standards of Instruction No. 16 — and particularly "the likelihood that [Harder] would actually restore [the property]" — would have placed great weight on the "contract" and related evidence. But the evidence should not have been admitted. In these circumstances, I conclude that this erroneous admission of evidence affected the substantial rights of the Wiersums. I would reverse on that basis and remand for a new trial on damages, including whether Harder had established a reason personal justifying the use of restoration costs as the measure of damages.

---

[4]     *Beech Aircraft Corp. v. Harvey*, 558 P.2d 879, 886-87 (Alaska 1976).

[5]     *Municipality of Anchorage v. Devon*, 124 P.3d 424, 432 n.28 (Alaska 2005) (quoting *Wyatt v. State*, 981 P.2d 109, 115 (Alaska 1999) (quoting *Love v. State*, 457 P.2d 622, 631-32 (Alaska 1969))).

[6]     *Barton v. N. Slope Borough Sch. Dist.*, 268 P.3d 346, 349 (Alaska 2012) (quoting *Cartee v. Cartee*, 239 P.3d 707, 721 (Alaska 2010)).

WINFREE, Justice, concurring in part and dissenting in part.

I agree that the judgment in this case must be reversed, but for the reasons expressed by Justice Carpeneti in his concurring opinion; I otherwise agree with the per curiam opinion. I write separately to note that the parties apparently agree that the treble damages provision of AS 09.45.730 applies to restoration damages and to acknowledge that Chief Justice Fabe's concurring opinion raises an important concern about the upper limits of restoration damages. But the latter issue was not raised in the superior court or on appeal. Absent appropriate briefing on this legal issue, I prefer that the parties raise it in the superior court on remand.

STOWERS, Justice, with whom MAASSEN, Justice, joins, concurring in part and dissenting in part.

Although I agree with most of the court's opinion, I respectfully disagree with its decision to vacate the jury's restoration damages award and order a new trial on damages. By vacating the jury's damages award, the court today intrudes into the jury's role as factfinder and impermissibly substitutes its own judgment for that of the jury.

We have long recognized the fundamental role juries play in our legal system. Juries are the voice of reason, conscience, and community, and we trust them to make difficult decisions touching upon life and death. It is the jury's responsibility to "make the difficult and uniquely human judgments that defy codification and that build discretion, equity, and flexibility into a legal system."[1] We the court are obligated to respect these judgments. In the words of the United States Supreme Court, "In no case is it permissible for the court to substitute itself for the jury, and compel a compliance on the part of the latter with its own view of the facts in evidence, as the standard and measure of that justice, which the jury itself is the appointed constitutional tribunal to award."[2]

Our standards of review reflect the deference and respect with which we treat jury verdicts. It is well established that "[o]ur role in reviewing a grant of a [JNOV] motion . . . is not to weigh conflicting evidence or judge the credibility of witnesses, but rather to determine whether the evidence, when viewed in light most favorable to the non-moving party, is such that reasonable persons could not differ in their

---

[1] *McCleskey v. Kemp*, 481 U.S. 279, 311 (1987) (internal quotation marks and alterations omitted).

[2] *Barry v. Edmunds*, 116 U.S. 550, 565 (1886).

judgment."[3]  This test is objective,[4] and a JNOV motion must "be scrutinized under a principle of minimum intrusion into the right to jury trial guaranteed under the Alaska Constitution."[5]  "[I]f there is room for diversity of opinion among reasonable people, the question is one for the jury."[6]

The Restatement (Second) of Torts provides:

[T]he reasonable cost of replacing the land in its original position *is ordinarily allowable* as the measure of recovery. . . . If, however, the cost of replacing the land in its original condition is disproportionate to the diminution in the value of the land caused by the trespass, *unless there is a reason personal to the owner for restoring the original condition*, damages are measured only by the difference between the value of the land before and after the harm.[7]

We expanded upon this requirement in *Osborne v. Hurst*, where we held that a party may recover restoration costs disproportionate to the diminution in market value so long as that party can also prove an objectively reasonable reason personal and the added costs are objectively reasonable in light of the established reason personal and the diminution

---

**3**     *Heynen v. Fairbanks*, 293 P.3d 470, 474 (Alaska 2013) (quoting *Korean Air Lines Co. v. State*, 779 P.2d 333, 338 (Alaska 1989)) (internal quotation marks and alterations omitted).

**4**     *Id.*

**5**     *Cameron v. Chang-Craft*, 251 P.3d 1008, 1018 (Alaska 2011) (quoting *City of Delta Junction v. Mack Trucks, Inc.*, 670 P.2d 1128, 1130 n.2 (Alaska 1983)) (internal quotation marks omitted).

**6**     *Heynen*, 293 P.3d at 474 (internal quotation marks omitted).

**7**     RESTATEMENT (SECOND) OF TORTS § 929(1)(a) cmt. b (1977) (emphasis added).

in market value.[8]  In reversing the superior court's grant of summary judgment, we further noted that "[t]he issues of whether replacement costs should be awarded and the extent to which such costs might have been reasonable *should properly have been left for the jury.*"[9]

Here, the superior court properly left these factual questions to the jury's discretion, yet the court today reverses the jury's restoration damages award.  In justifying this reversal, the court notes that the jury "was required to base its restoration award on a finding that the restoration costs were objectively reasonable in light of the value of Harder's land, the diminution of its value, and his reason personal."  But the jury did exactly that here.  It is undisputed that the jury was properly instructed on *Osborne*: the jury instructions expressly provided that the jury could not find that Harder was entitled to restoration damages unless it also found that "the cost of restoring the property is not disproportionate to the loss in property value caused by the trespass or, if it is disproportionate, that there is a 'reason personal' to Mr. Harder for restoring the property to its original condition.' "[10]  The instructions further provided that "[o]nce a 'reason personal' is found, restoration costs exceeding diminished market value may be awarded only to the extent that such added costs are objectively reasonable in light of the 'reason personal' and in light of the diminished market value."  Accordingly, the jury found that although the market value of the trees was only $3,520, there was a reason personal that justified an award of $161,000.  There is no indication in the record that the jury disregarded the jury instructions in arriving at these figures, and it was reasonable for the jury to conclude that Harder was entitled to compensation for the loss of the trees and

---

[8]      947 P.2d 1356, 1360 (Alaska 1997).

[9]      *Id.* (emphasis added).

[10]      *See id.*

damage to his property; that there was a "reason personal" to Harder for restoring the property to its original condition; and that an award of $161,000 was objectively reasonable in light of Harder's reason personal and in light of the diminished market value.[11]

The court concludes that "[t]he record shows that Harder's property could be reasonably restored by replacing at least some of the mature Sitka spruce with saplings or small trees and that because the property's large trees were 'growing in a forested environment where the root zones [were] intertwined' it was not possible to 'replace that exact tree in that environment.' " This holding suggests that it was reasonable for Harder to replant small trees in order to restore the property damaged by the Wiersums, but it was unreasonable for him to plant trees similar in size to those that were cut down. But Harder specifically testified that the size of the trees was part of what contributed to his enjoyment of the property: he described the privacy provided by the trees, the ravens that once frolicked in the trees, and the overall beauty of the property. Harder also explained how because of the trespass, he had lost his privacy, he no longer heard the ravens in the trees, and the entire property had been "destroyed." It was for the jury and not this court to determine whether Harder's reason personal was such that the compensatory restoration damages should cover the costs of the larger, more expensive trees and whether, to the extent these restoration costs exceeded diminished market value, they were objectively reasonable in light of the reason personal and in light of the diminished market value.[12]

Applying our standards of review to the jury's damages award, reversal was appropriate only if the evidence, when viewed in the light most favorable to Harder,

---

[11]    *See id.*

[12]    *See id.*

"was such that reasonable persons could not differ in their judgment."[13]  This standard clearly was not met.  It was undisputed that the Wiersums significantly altered the character of Harder's property; the Wiersums clear-cut an entire hillside, destroying at least 70 of Harder's large trees in the process.  Thus a significant compensatory damages award was not unwarranted.  Four different expert witnesses testified on the cost of restoring the land, and their estimates varied widely:  an arborist testified that it would cost $161,000 to transplant 70 Sitka spruce that were nine to ten feet tall and an additional $162,500 to replace the forest ground cover; a horticulturist testified to a different method of transplanting larger trees and estimated it would cost $620,537 to restore Harder's property; another arborist estimated restoration would cost about $34,000 to replant smaller Sitka spruce transplanted from other areas of Kodiak; and an expert in real estate testified that the value of the lot would be "minimally affected, if at all" by the removal of the trees.  The evidence presented at trial thus established that although the property had not suffered any diminution in market value as a result of the lost trees, restoration would cost as much as $620,537.  Given the conflicting evidence and the variety of testimony on the costs of restoration — which the jury and not this court had the opportunity to weigh and to judge — it was within an acceptable range of reason for the jury to conclude that an award of $161,000 in compensatory restoration damages was appropriate.

Moreover, the court's conclusion that Harder's property could reasonably be restored by replacing some of the mature Sitka spruce with saplings or smaller trees

---

[13]  *Heynen v. Fairbanks*, 293 P.3d 470, 474 (Alaska 2013) (quoting *Korean Air Lines Co. v. State*, 779 P.2d 333, 338 (Alaska 1989)) (internal quotation marks and alterations omitted).

relies exclusively on expert testimony provided by the Wiersums.[14]  But as the court itself recognizes, "generally the only evidence that should be considered [in reviewing the denial of a JNOV motion] *is the evidence favorable to the non-moving party*."[15]  It is improper for the court to rely on evidence presented by the Wiersums to conclude that the restoration award was unreasonable, and none of the evidence presented by Harder supports the court's conclusion.[16]  The court today acts in direct disregard of the proper standard of review.

By reversing the jury's damages award, which was supported by ample evidence in the record and based on proper jury instructions, the court invades the province of the jury without any justification for so doing.  We have long relied on juries to serve as the quintessential collective "reasonable" person and entrusted them to make

---

[14]    The court relies on "[t]he record" to hold that Harder's property could be reasonably restored by replacing mature Sitka spruce with saplings or smaller trees and that it was not possible to fully replicate the environment on Harder's property.  But the only evidence in the record to support this conclusion was testimony provided by an arborist appearing on the Wiersums' behalf.

[15]    *Cameron v. Chang-Craft*, 251 P.3d 1008, 1018 (Alaska 2011) (emphasis added).

[16]    For support the court cites *Heninger v. Dunn*, 162 Cal. Rptr. 104, 108-09 (Cal. App. 1980), a case from the California Court of Appeal.  *Heninger* established that in California, restoration costs may exceed diminution in value where there is a reason personal.  *Id.* at 107-08.  *Heninger* also established, however, that such costs "may be unreasonable or excessive in relation to the damage inflicted upon the land or its value prior to the trespass."  *Id.* at 108-09 (internal citations omitted).  The case therefore recognizes a rule that fundamentally differs from our own jurisprudence in that the determination of whether costs are unreasonable does not take into account the reason personal.  *See id.*  Moreover, *Heninger* was not a jury case.  *Id.* at 106.

important factual determinations.[17] A jury of twelve did exactly that here and arrived at a consensus after following proper jury instructions and evaluating conflicting evidence, and yet the court holds their determination was unreasonable. I disagree with this holding and therefore dissent from the court's decision to vacate the damages award and order a new trial on damages.[18]

---

[17] *See Sioux City & Pac. R.R. Co. v. Stout*, 84 U.S. 657, 664 (1873) ("Twelve men of the average of the community, comprising men of education and men of little education, men of learning and men whose learning consists only in what they have themselves seen and heard, the merchant, the mechanic, the farmer, the laborer; these sit together, consult, apply their separate experience of the affairs of life to the facts proven, and draw a unanimous conclusion. This average judgment thus given it is the great effort of the law to obtain. It is assumed that twelve men [and women] know more of the common affairs of life than does one man, that they can draw wiser and safer conclusions from admitted facts thus occurring than can a single judge.").

[18] I also disagree with Justice Carpeneti's partial dissent's conclusion that the admission of evidence of Harder's contract with the jury "fatally infected the jury's finding that Harder had a 'reason personal' that would justify the use of restoration damages at all." The jury's reason personal finding was amply supported by other evidence in the record that was properly admitted: Harder testified that he had purchased the Monashka property for its natural beauty, that he had fond memories of hiking and fishing in the area as a boy and of spending time on the property with his friends and family over the years, that he had owned the property for over 30 years, that he had always intended to keep Lot 1A, that he intended to live there once his son had graduated and he had sufficient funds to build a house, and that the trees had contributed to the property's natural beauty and privacy. Harder's sister confirmed that Harder intended to build a cabin on the property, and a real estate agent also confirmed that Harder had refused to sell the property. Thus any error in the superior court's decision to admit Harder's contract with the jury was at worst harmless error and did not provide grounds for reversal.